DECISION
Defendant-appellant, K-Mart Corporation, appeals from a judgment of the Franklin County Court of Common Pleas in favor of plaintiffs-appellees, Virginia and Macleo Ariguzo.
Appellees brought their action as a result of an incident occurring on August 16, 1996, at a K-Mart store in Westerville, Ohio, in which Virginia Ariguzo was apprehended and detained by K-Mart store personnel for allegedly shoplifting a bag of diapers. The complaint alleged causes of action against K-Mart for false imprisonment, assault and battery, defamation, and intentional infliction of emotional distress. The complaint also alleged that K-Mart had acted with malice, and sought punitive damages and attorney fees. A derivative claim for loss of services and loss of consortium was brought on behalf of appellee Macleo Ariguzo, Virginia's husband.
Appellees subsequently filed a complaint against individual K-Mart store employees and a company known as Loss Prevention Specialists ("LPS"), which contracted with K-Mart to make civil recovery collections against alleged shoplifters. The second complaint against the new defendants alleged substantially the same claims as the first complaint with the addition of a cause of action for violation of the Fair Debt Collection Practices Act. The actions were subsequently consolidated by agreement of the parties.
At the outset of trial, appellees dismissed the individual K-Mart employees on stipulation from K-Mart that all acts of its employees and store personnel were taken on behalf of, and were to be imputed to, K-Mart. The Fair Debt Collection Practices Act action against LPS was also dismissed, leaving only defamation and intentional infliction of emotional distress claims against LPS based upon various letters sent to Virginia Ariguzo by LPS threatening her with civil litigation if she did not pay for the allegedly stolen items.
While various facts surrounding Virginia's detention at the K-Mart store were in dispute at trial, K-Mart does not assert for purposes of this appeal, that Virginia was guilty of shoplifting the items which she was accused of taking. Virginia's testimony, briefly summarized, was that on the day in question she decided to return some Luvs diapers which her husband had previously purchased, to exchange for a brand which she preferred. She first went to the store's service desk with the previously purchased diapers, and showed her receipt to K-Mart staff at the desk. She left the diapers at the service desk and went to look for her preferred brand in the infant section. Being unable to find it, she selected a box of Pampers brand diapers. At some point, an employee instructed Virginia to check the "sidewalk sale" in front of the store to see if the Huggies brand which she sought were available there.
Virginia left her shopping cart containing the Pampers which she previously selected at the service desk and went outside. Not finding any Huggies brand diapers outside, she returned to the service desk. A different K-Mart employee was working the service desk, and explained that the Pampers were more expensive than the Luvs which she had sought to return. Virginia then decided to keep the Luvs, and proceeded to the check-out line with several other items she intended to purchase. She showed the cashier the receipt to demonstrate that the bag of Luvs had been previously purchased, and paid for the other items. As she was leaving the store, she noticed a man whom she thought had been following her in the store. She felt uncomfortable and nervous, so she returned to the service desk and asked if she could have an escort out of the store to her car, because of her fear of this individual watching her. As Virginia was escorted from the store, the man who had been watching her stepped in front of her, flashed an I.D. card, and declared that she was being arrested for shoplifting.
Virginia immediately showed this individual, K-Mart loss prevention employee Eric Scott, her receipt and declared that she had not stolen the Luvs diapers. Scott nonetheless pushed her shopping cart against her, told her she was under arrest and with the assistance of other K-Mart employees took her to a small room in the store and began to interrogate her. At one point, Virginia was forcefully pushed down into a chair and prevented from standing. She was very upset and in tears, which made it difficult for her to answer some of the questions she was being asked.
The various K-Mart employees pressed Virginia to sign an admission of guilt, which she adamantly refused to do. She was unable for some time to get them to acknowledge that she had a receipt. After almost an hour of interrogation, the loss prevention supervisor, Kelly Johnson, finally took Virginia's receipt to check the universal product code against the Luvs diapers, which established that the Luvs had been purchased the day before. At one point, a K-Mart employee asked Virginia how much money she had on her person. When she replied that she did not know, the employee took her handbag from her and emptied it on the table, counting the two hundred eighty-four dollars it contained.
Despite her adamant refusal to admit to shoplifting, and her possession of a valid receipt, the K-Mart employees refused to concede that a mistake had been made. They then pressed Virginia for a signature on a release of liability form, which would absolve K-Mart of all liability for her detention. Virginia was told that if she did not sign the release, she would not be allowed to leave the room. When she eventually signed the release under duress, and went to leave, she was not allowed to take her bag of Luvs diapers, because Kelly Johnson still insisted that the diapers were the property of K-Mart. Virginia was eventually allowed to take the diapers and leave. She estimated the total time of detention in the room at the K-Mart store as approaching two hours.
Macleo Ariguzo described his wife as a very happy easy-going person prior to her shoplifting detention, but afterwards she became extremely sensitive and he was forced to live as if with a new person. Virginia became less active around the house and seemed withdrawn and deeply afflicted by embarrassment because of the theft accusation. Both Virginia and Macleo stressed that in their native country, Nigeria, a theft accusation carries extremely serious consequences for the reputation both of the person involved and their family.
Macleo testified that he was never able to obtain an apology from K-Mart. Over time the Ariguzos received a series of five letters from LPS and a Cincinnati law firm, Palmer 
Associates. These letters requested payment on behalf of K-Mart for the alleged debt for the "stolen" Luvs diapers. Virginia's mental state eventually caused Macleo to call Harding Hospital where Virginia was referred to a psychiatrist, Dr. Fred Romeo. Dr. Romeo determined that her low energy and low motivation, sleep disorder, loss of concentration, tearfulness, and loss of general interest in previously pleasurable activities were symptoms of post-traumatic stress disorder.
Dr. Romeo testified that his initial diagnosis of Virginia was major depressive disorder and post-traumatic stress disorder related to her detention at the K-Mart store and her reaction to the events of the day. Dr. Romeo determined that the conditions were serious, and recommended continuing psychotherapy. He also prescribed anti-depressant medication, and continued to see her on a monthly basis. Dr. Romeo testified that he encouraged her to continue working because he felt it was therapeutic. He had seen some improvement in Virginia's condition, but not as much as he would have liked, and could not say whether she would ever fully recover. When shown some of the letters sent to the Ariguzos by LPS or Palmer Associates, Dr. Romeo opined that such letters would be triggering events for Virginia's post-traumatic stress syndrome, causing her to relive the tension which had been so stressful for her.
At the conclusion of appellees' case-in-chief, both K-Mart and LPS moved for directed verdicts on all claims. The trial court granted a directed verdict for LPS on both the defamation and intentional infliction of emotional distress claims. The trial court, however, denied all directed verdict motions with respect to K-Mart.
Appellant's defense was primarily based on the testimony of Kelly Johnson, loss prevention supervisor at the K-Mart store where Virginia was detained. Johnson testified that on the day in question he was paged to the front desk to assist Eric Scott and other K-Mart personnel who were detaining Virginia. Johnson described her behavior at that time as "screaming, hollering, creating a big scene." Johnson obtained an explanation from Eric Scott for the reason that Virginia had been detained. He then attempted to discuss the matter with Virginia, but she refused to calm down. Johnson's testimony was that Virginia was uncontrollable, incomprehensible, and totally uncooperative. Johnson was not surprised by this conduct, because in his experience most shoplifters would behave this way, in an attempt to cause the store to release them to avoid creating a scene in front of other shoppers.
Johnson testified that Virginia eventually returned to his office to be interviewed. His recollection was that at no time was she pushed with a shopping cart, nor was she physically forced to sit down in a chair in the office. Johnson's recollection was that Virginia voluntarily showed the contents of her purse to establish that she had plenty of money and would not have had to resort to shoplifting. Johnson testified that during the interview, Virginia remained very loud, and was standing, waving her arms, and screaming. He was concerned because she was exhibiting characteristics of past detainees who had become dangerous.
After perhaps forty-five minutes of questioning, Virginia finally produced a receipt which Johnson verified covered the purchase of a similar bag of diapers the day before. Johnson was not totally convinced, however, because a common shoplifters' tactic is to use such an aged receipt in order to steal new merchandise. He nonetheless allowed her to leave with the diapers.
Johnson testified that, despite having determined that Virginia would not be charged with shoplifting, and despite the fact that he had allowed her to leave with the bag of diapers, he nonetheless transmitted the report on the incident to LPS for collection purposes. He testified that he did this as a matter of "procedure."
The defense also called Rahlene Elder, a former K-Mart employee who was working the Westerville store at the time of Virginia's detention. Elder testified that she was a cashier, and was summoned to the loss control office to serve as a female witness, in accordance with K-Mart policy when a female suspected shoplifter was detained. Elder was present for perhaps an hour and a half while Virginia was interviewed. During this time she did not witness anyone dump Virginia's purse out on the table, or physically touch her in any form. On cross-examination, Elder recalled that Virginia was told that she would not be allowed to leave until she had signed a release of liability in favor of K-Mart.
After deliberation, the jury rendered its verdict awarding Virginia $40,500 in compensatory damages, and Macleo $17,500 in compensatory damages for his loss of consortium claim. The jury further awarded appellees $350,000 in punitive damages, and found that appellees were entitled to an award of attorney fees, with the amount to be set by the trial court. The trial court then granted appellees' motion for prejudgment interest on the compensatory damages, and also on the award of attorney fees. The total amount awarded to appellees from K-Mart in the trial court's judgment entry was $58,000 in compensatory damages, $350,000 in punitive damages, $71,000 in attorney fees, and $26,874 in prejudgment interest.
Appellant has timely appealed and brings the following assignments of error:
 1. THE TRIAL COURT ERRED BY DENYING K-MART'S MOTION FOR DIRECTED VERDICT ON THE CAUSE OF ACTION FOR ASSAULT, AND IN INSTRUCTING THE JURY ON ASSAULT.
 2. THE TRIAL COURT ERRED BY DENYING K-MART'S MOTION FOR DIRECTED VERDICT ON PLAINTIFFS' CLAIM OF DEFAMATION, AND IN INSTRUCTING THE JURY ON DEFAMATION.
 3. THE TRIAL COURT ERRED BY DENYING K-MART'S MOTION FOR DIRECTED VERDICT ON PLAINTIFFS' CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF SERIOUS EMOTIONAL DISTRESS, AND IN INSTRUCTING THE JURY ON INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.
 4. THE TRIAL COURT ERRED IN DENYING THE MOTION OF K-MART FOR A DIRECTED VERDICT ON THE ISSUE OF PUNITIVE DAMAGES, AND BY ALLOWING THE ISSUE OF PUNITIVE DAMAGES TO GO TO THE JURY.
 5. THE TRIAL COURT ERRED IN AWARDING PREJUDGMENT INTEREST TO PLAINTIFFS/APPELLEES.
 6. THE TRIAL COURT ERRED IN GRANTING PREJUDGMENT INTEREST TO PLAINTIFFS ON THE AWARD OF ATTORNEY FEES.
 7. THE TRIAL COURT ERRED IN THE AMOUNT THAT IT AWARDED AS ATTORNEY FEES.
 8. THE TRIAL COURT ERRED IN DENYING THE MOTION OF K-MART FOR REMITTITUR.
Appellant's first assignment of error asserts that the trial court erred in denying its motion for directed verdict on appellees' cause of action for assault. When addressing a motion for directed verdict under Civ.R.50(A), the trial court must consider neither the weight of the evidence nor the credibility of the witnesses. Strother v. Hutchinson (1981), 67 Ohio St.2d 282,284. If there is substantial competent evidence to support the party against whom the motion is made, even if reasonable minds might reach different conclusions on such evidence, the motion must be denied. Wagner v. Roche Lab. (1996), 77 Ohio St.3d 116,119, citing Kellerman v. J.S. Durig Co. (1964), 176 Ohio St. 320. A motion for directed verdict presents no factual issues but only questions of law, even though in deciding such a motion the court must of necessity review and consider the evidence. O'Day v. Webb
(1972), 29 Ohio St.2d 215, paragraph three of the syllabus. "The `reasonable minds' test of Civ.R. 50(A)(4) calls upon the court only to determine whether there exists any evidence of substantial probative value in support of [the nonmoving party]. * * * A motion for directed verdict raises a question of law because it examines the materiality of the evidence, as opposed to the conclusions to be drawn from the evidence." Ruta v. Breckenridge-Remy Co. (1982),69 Ohio St.2d 66, 69.
Appellees' complaint alleged causes for assault and battery upon Virginia Ariguzo. "A battery consists of the unlawful and unauthorized application of force to another person. An essential element of a battery is the intent to inflict injury unless the person inflicting injury is also violating a state statute or an ordinance." Sims v. Kroger, Inc. (Feb. 29, 1996), Franklin App. No. 95APE08-1056, unreported (1996 Opinions 703, 711-712), quoting Thomas v. Washington Dist., Inc. (Nov. 30, 1978), Franklin App. No. 78AP-384, unreported (1978 Opinions 3367, 3371). "The tort of assault is defined as the willful threat or attempt to harm or touch another offensively, which threat or attempt reasonably places the other in fear of such contact."Sims, supra. Assault is thus distinguishable from battery because it requires a plaintiff to be placed in fear or apprehension of physical contact. Smith v. John Deere Co. (1993), 83 Ohio App.3d 398,406.
Virginia Ariguzo testified that when she was first apprehended by Eric Scott, he pushed the shopping cart against her to force her back into the store. She then felt that she had no choice but to go with him into the store. Kelly Johnson, K-Mart's loss control manager on duty, testified that when Virginia was first detained at the front of the store, she was crying, screaming and seemed frightened. Later, during Virginia's detention in thee security office, she testified that on least two occasions a store employee physically forced her to sit down on a chair. Thereafter she signed the release from liability, which was forced upon her before she was allowed to leave.
From these two incidents, the finder of fact could reasonably infer that Virginia was in immediate apprehension of further immediate physical contact if she, on first occasion, failed to enter the store with K-Mart security personnel, and on the second occasion, failed to execute the release from liability which was imposed as a condition of her release from detention. Under the standard for directed verdict, which did not require the trial court to weigh the probative value of this evidence, it was not error for the trial court to deny the motion for directed verdict on the assault cause of action because there was legally sufficient evidence to take the case to the jury. Appellant's first assignment of error is accordingly overruled.
Appellant's second assignment of error asserts that the trial court erred in denying K-Marts motion for directed verdict on appellees' defamation claims against K-Mart. This cause of action was based upon the transmittal of a "loss control report" from K-Mart to LPS, which sent several civil recovery letters based upon the contents of the loss control report. When LPS closed its file, the information was forwarded to Palmer 
Associates, a collection law firm in Cincinnati. Palmer 
Associates sent further collection letters to appellees.
The thrust of appellant's argument is that the transmittal of the loss control report to LPS would not constitute "publication" which would support a cause of action for defamation against K-Mart. Appellant cites Akron-Canton Waste Oil, Inc. v.Safety-Kleen Oil Services, Inc. (1992), 81 Ohio App.3d 591, for the proposition that the "commonality of interest" between K-Mart and LPS established a qualified privilege to reveal false, disparaging information about Virginia Ariguzo.
In Ohio, a plaintiff bringing a libel claim must prove a false written publication, made with some degree of fault, reflecting injuriously on plaintiff's reputation or exposing the plaintiff to public hatred, contempt, ridicule, shame, or disgrace, or affecting plaintiff adversely in his trade, business or profession. A B-Abell Elevator Co., Inc. v. Columbus-CentralOhio Building Construction Trades Council (1995), 73 Ohio St.3d 1. A qualified privilege of publication may exist in a commonality of interest case:
 A communication made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty even though it contains matter which, without this privilege would be actionable * * *. The essential elements of a conditionally privileged communication may accordingly be enumerated as good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only * * *." Hahn v. Kotten (1975), 43 Ohio St.2d 237, 246.
If the qualified privilege of the commonality of interest is established, the plaintiff must show that the defendant acted with actual malice in publishing the defamatory statement. Evely v. Carlon Co. (1983), 4 Ohio St.3d 163; Jacobs v.Frank (1991), 60 Ohio St.3d 111. Actual malice is defined as knowledge by the defendant that the statements were false, or statements made with reckless disregard of whether they were false or not. Hahn, supra, paragraph two of the syllabus.
In the present case, when K-Mart notified LPS via the transmitted report identifying Virginia Ariguzo as a shoplifter, K-Mart had ample information establishing the falsity of the report, or at least its dubious veracity. Virginia had shown the receipt for the diapers to K-Mart employees Kelly Johnson and Eric Scott on the day of her detention, and Johnson had eventually allowed Virginia to leave the store with the merchandise, thus conceding in practice, if not in full satisfaction of Johnson's suspicions, that Virginia was entitled to keep the diapers. Furthermore, K-Mart determined prior to notifying LPS that criminal charges against Virginia were not warranted. These facts thus establish that K-Mart had actual knowledge of the falsity of its letter or at the very least that K-Mart acted with reckless disregard regarding the underlying facts. Johnson's own testimony was that the letter to LPS was generated according to K-Mart "procedure," reinforcing the permissible inference that K-Mart issues information to collection agencies without regard to whether the subject individual is actually guilty of theft. This constituted sufficient evidence to defeat the motion for directed verdict on the basis that K-Mart had exceeded the bounds of any qualified privilege.
K-Mart further argues that its motion for directed verdict should have been granted because the trial court granted a similar motion by LPS for directed verdict. This is not persuasive because K-Mart and LPS were not in similar positions with respect to the publication of the information about Virginia. K-Mart alone was in possession of the information which established that the statement was false and defamatory. LPS was not in a similar situation, having no way of knowing the falsity of the theft report. When LPS therefore further transmitted the information to Palmer Associates, LPS was not doing so with the same malice imputable to K-Mart.
We therefore find that the trial court did not err in denying appellant's motion for directed verdict on the defamation claim, and appellant's second assignment of error is accordingly overruled.
Appellant's third assignment of error asserts that the trial court erred in denying K-Mart's motion for directed verdict on appellees' cause of action for intentional infliction of emotional distress. The elements required for a claim of intentional infliction of emotional distress are (1) the defendant intentionally or recklessly (2) engaged in extreme and outrageous conduct which (3) was the proximate cause of plaintiff's mental and emotional injury and (4) such mental anguish suffered by the plaintiff was serious. Hanley v. Riverside Methodist Hospital
(1991), 78 Ohio App.3d 73, 82. K-Mart argues only that the first element of the tort was not met as a matter of law in this case, and does not challenge the remaining three.
In the present case, Virginia testified that when she first entered the store she showed the valid receipt for the diapers she was exchanging at the service desk. She testified that she again showed the receipt to the cashier at the check-out line, and to Eric Scott when he initially detained her for shoplifting. Despite possession of this receipt, Virginia testified that she was physically forced to the security office and interrogated while K-Mart personnel denied her pleas for permission to call her husband and verify her story. K-Mart personnel attempted to coerce a written confession from her, and emptied her purse on the table without her consent. Even after loss prevention supervisor Kelly Johnson verified that the receipt from the previous day was valid, K-Mart did not allow her to leave. Instead, K-Mart personnel detained her in order to force her to sign a release of liability as a condition for being permitted to leave the store.
Despite the fact that Johnson had returned the diapers to Virginia when he finally allowed her to leave, Johnson nonetheless prepared and forwarded documentation to LPS for a civil theft recovery. As a result, Virginia and her husband received harassing and intimidating letters demanding payment for the diapers.
Giving appellees the benefits of all reasonable inferences and construing the evidence in appellees' favor, as required when addressing a motion for directed verdict, reasonable minds could reasonably conclude based upon the above-referred behavior that K-Mart acted with heedless indifference and conscious disregard for Virginia's rights. Under the circumstances, this amounted to reckless, if not intentional, conduct which fulfills the first element of the tort of intentional infliction of emotional distress. We therefore conclude that the trial court did not err in denying appellant's motion for directed verdict on this issue and therefore appellant's third assignment of error is overruled.
Appellant's fourth assignment of error asserts that the trial court erred in denying K-Mart's motion for directed verdict on the issue of punitive damages. Punitive damages in Ohio may only be awarded in tort actions in which actual damages have been proven, and the actions of the defendant involved malice. R.C.2315.21. The actual malice necessary for punitive damages is "(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm. Preston v. Murty
(1987), 32 Ohio St.3d 334, syllabus. (Emphasis sic). "[A]ctual malice can be inferred from conduct and surrounding circumstances which may be characterized as reckless, wanton, willful or gross."Villella v. Waikem Motors, Inc. (1989), 45 Ohio St.3d 36, 37.
Appellant asserts that appellees' evidence proved only, at worse, a string of negligent acts on the part of K-Mart. Appellant asserts that the K-Mart employees were faced with a unique set of circumstances, including Virginia Ariguzo's alleged erratic and emotionally uncontrollable behavior during her detention, her difficulty communicating due to a language barrier, and circumstances under which K-Mart loss prevention personnel drew legitimate inferences from Virginia's conduct in the store. Again, we are reviewing on appeal only the trial court's denial of K-Mart's motion for directed verdict, and thus draw all inferences on the evidence at trial in favor of appellees. Without unnecessarily reiterating the conduct of K-Mart personnel as set forth in response to the previous assignments of error, there was sufficient evidence before the court to allow the issue of punitive damages to go to the jury. In particular, K-Mart's conduct after Kelly Johnson had ascertained that no charges would be brought against Virginia, by detaining her in an attempt to coerce the execution of a release from liability in favor of K-Mart, and thereafter forwarding the file for collection to LPS, could allow the finder of fact to infer that K-Mart's conduct under the circumstances was "characterized as reckless, wanton, willful or gross." Villella, supra. We therefore conclude that the trial court did not err in denying directed verdict on this issue. Appellant's fourth assignment of error is accordingly overruled.
Appellant's fifth assignment of error asserts that the trial court erred in awarding prejudgment interest to appellees.
The present action commenced in November 1996, and thus former R.C. 1343.03(C) applies in determining appellees' right to recover prejudgment interest. Lovewell v. Physicians Ins. Co. ofOhio (1997), 79 Ohio St.3d 143,144. As then written this provision provided for an award of prejudgment interest if "the party required to pay the money failed to make a good faith effort to settle the case and * * * the party to whom the money is to be paid did not fail to make a good faith effort to settle the case." A finding of bad faith is not necessary to show that a party has not made a good faith effort to settle. Kalain v. Smith (1986),25 Ohio St.3d 157, 159; Moskovitz v. Mt. Sinai Med. Center (1994),69 Ohio St.3d 638. A party has failed to make a good faith effort to settle if the party has (1) failed to fully cooperate in discovery, (2) failed to rationally evaluate its risks and potential liability, and (3) tried to unnecessarily delay the proceedings or, (4) fails to make a good faith monetary settlement offer or to respond in good faith to an offer by the opposing party. Kalain, syllabus. "A trial court has wide discretion in deciding whether to award prejudgment interest based upon the evidence of the parties' settlement efforts." Miller v. Leesburg
(Dec. 1, 1998), Franklin App. No. 97AP-1379, unreported, (1998 Opinions 5245, 5280).
The trial court noted that the initial settlement offers exchanged by the parties in this case were $150,000 for appellees and $5,000 for appellant. At the second mediation conference in June 1998, appellees reduced their demand to $100,000 which appellant countered with an offer increased only to $7,500. On the first day of trial, appellees again reduced their offer from $100,000, and the trial court instructed K-Mart's counsel at that time to contact responsible individuals at the company who had authority to further negotiate. No counteroffer was forthcoming.
All of this apparent intransigence on the part of K-Mart took place in the face of pessimistic assessments from trial counsel regarding K-Mart's prospects in the matter as the case went to trial. Documentation before the trial court at the fee hearing showed that counsel advised K-Mart that there was a zero percent to ten percent chance of obtaining a defense verdict, damages awarded might range to $50,000 and that a settlement offer between $20-30,000 was recommended. Later documents prepared at the completion of discovery indicate that counsel advised K-Mart that the latest settlement offer of $7,500 was "insufficient."
The trial court addressed the above-outlined settlement history of the case in a thorough and well-reasoned decision. The trial court found that K-Mart had "no objectively reasonable basis to believe that it had no liability or minimal financial exposure," and that "K-Mart failed to make good faith efforts to settle the case and was unreasonable in its caviler effort to properly evaluate the risks before proceeding to trial." On the above evidence before the trial court, we find no abuse of discretion in the trial court's conclusion. We therefore find that the trial court did not err in awarding prejudgment interest to appellees. Appellant's fifth assignment of error is accordingly overruled.
Appellants' sixth assignment of error asserts that the trial court erred in granting prejudgment interest to appellees on the award of attorney fees. The parties have presented no controlling Ohio case law or statutory authority on the issue of whether prejudgment interest may properly be granted on an award of attorney fees. Appellees argue that prejudgment interest, being awardable on compensatory damages for a defendants' dilatory tactics and failure to negotiate in good faith, by extension may be awarded on attorney fees. Appellant contends to the contrary that the award of attorney fees should be more appropriately compared to an award of punitive damages, upon which it is well-settled that prejudgment interest may not be awarded.Villella, supra, at 41.
We find appellants' position most persuasive. "* * * [B]ecause an award of punitive damages is `over and above the amount adequate to compensate' the plaintiff, * * * there is no need to award prejudgment interest on the punitive damages in order to compensate the plaintiff further for a delay in payment."Villella, at 42, citing Ranells v. Cleveland (1975), 41 Ohio St.2d 1,7. Likewise, the award of fees was not compensatory, but was predicated upon an award of punitive damages. The comparison to punitive damages with respect to prejudgment interest is appropriate, and we accordingly find that the trial court erred in awarding prejudgment interest on the award of attorney fees. Appellant's sixth assignment of error is accordingly sustained.
`Appellant's seventh assignment of error asserts that the trial court erred in computing the amount awardable as attorney fees. The determination of the amount of attorney fees awarded to prevailing parties lies within the sound discretion of the trial court and will not be reversed absent an abuse of discretion.Village of Gates Mills v. Jones (1994), 95 Ohio App.3d 341, 346. The award of attorney fees shall be computed according to the "lodestar" method, wherein the trial court shall first calculate the number of hours reasonably expended on the case by counsel, and then multiply that number by a reasonable hourly rate. Bittnerv. Tri-County Toyota, Inc. (1991), 58 Ohio St.3d 143, syllabus. Factors to be considered are the time and labor involved in maintaining the litigation, the novelty, complexity, and difficulty of questions involved, the professional skill required to perform the necessary legal services, and the experience, reputation, and ability of the attorneys. Villella, at 41. The court will also consider the fees customarily charged in the locality for similar legal services, the amounts involved in the litigation, and the results obtained. Id. citing DR2-106(B), Code of Professional Responsibility.
K-Mart initially challenges the trial court's award of an hourly rate of $200 for attorney Mark Jurkovac. Appellant points out that this is a significant multiple of the fees which attorney Jurkovac receives in court-appointed criminal cases. We decline to penalize any member of the profession for undertaking court-appointed representation of indigent litigants, and will give this argument no further consideration. There is little, if any logic, in comparing the evaluation of fees in a complex civil action to fees paid a lawyer for representing an indigent defendant in a criminal case.
Appellant also points to various instances in which comparison of time sheets submitted by the two lead counsel for appellees indicate some duplication of preparation and effect between the two attorneys. The trial court was presented with this argument and concluded there was "unintended but limited duplication of effort in studying the law and prearing the case for trial." Appellant also points to various instances of alleged excessive expenditure of time and preparation, such as six hours spent preparing for a deposition which lasted one hour and fifteen minutes. Appellant also alleges that counsel spent ninety-three and eighty-five hours respectively preparing for trial, which appellant considers excessive. We note that appellant did not present any expert testimony at the hearing before the trial court as to the reasonableness of the fees either in an amount or time billed.
All the specific instances alleged by appellant were brought to the trial court's attention at the hearing. The trial court was more familiar with the challenges and circumstances of the litigation as it developed prior to and through trial, and therefore was in a fundamentally superior position to ascertain the appropriateness of the fees presented by counsel for appellees. Under the circumstances of this case, we find no reason to disturb the trial court's judgment as to both computation of the appropriate hourly fee and the reasonably expended number of hours pursuant to Bittner. Appellant's seventh assignment of error is overruled.
Appellant's eighth assignment of error asserts that the trial court erred in denying appellants' motion for remittitur of the $350,000 punitive damage award. "An award of punitive damages will generally not be overturned unless it bears no rational relationship or is so grossly disproportionate to the amount of compensatory damages awarded that the award appears to be the result of passion or prejudice." Bauer v. Georgeff (Sept. 1, 1998), Franklin App. No. 97AP-313, unreported, (1998 Opinions 3930) Furthermore, the purpose of punitive damages must be distinguished from compensatory damages, because they are not intended to compensate the plaintiff but to punish and deter certain conduct by defendant. Moskovitz, supra, at 651. The size of a punitive damages award will thus of necessity be tailored not only to the harm done to the plaintiff, but to the relative size and financial means of the defendant.
In the present case, the amount of the punitive damages award was appropriate when considering both of the above-cited bases. In Bauer, this court upheld a punitive damages award of $75,000 on $12,000 in compensatory damages, approximately the same proportion as in the present case. Moreover, a recent award of $1,500,000 in punitive damages on only $15,000 in compensatory damages was upheld by the Supreme Court in Williams v. AetnaFinance Co. (1998), 83 Ohio St.3d 464. Finally, in relation to the size and financial means of the defendant and the anticipated deterrent effect, the punitive damages award is appropriate in the present case. We therefore find that the trial court did not err in denying appellant's motion for remittitur. Appellant's eighth assignment of error is therefore overruled.
Based upon the foregoing, appellant's first, second, third, fourth, fifth, seventh, and eighth assignments of error are overruled. Appellant's sixth assignment of error has merit and is sustained. The judgment of the Franklin County Court of Common Pleas is affirmed in all respects with the exception of the award of prejudgment interest on attorney fees. The matter is remanded to the trial court for modification in accordance with this decision.
Judgment affirmed in part, reversed in part; and cause remanded.
TYACK, J., and LAZARUS, P.J., concur.