SMITH et al., Appellants and Cross–Appellees; Smith, Appellee,

v.

JOHN DEERE COMPANY et al., Appellees and Cross–Appellants.

[Cite as *Smith v. John Deere Co.* (1993), 83 Ohio App.3d 398.]

Court of Appeals of Ohio,
Franklin County.

No. 92AP–1508.

Decided March 30, 1993.

*Crabbe, Brown, Jones, Potts & Schmidt* and *John M. Gonzales,* for appellants and cross-appellees.

*McFadden, Winner and Savage* and *Joseph C. Winner,* for appellees and cross-appellants.

TYACK, Judge.

On May 28, 1991, Cathy Smith, Paul Smith and Jacqueline Holbrook filed suit against the John Deere Company, David Witt and Wayne LaRue. The lawsuit alleged that the John Deere Company and its agents were liable for injuries sustained and damages incurred during an unsuccessful attempt at repossessing certain farm equipment. The complaint which initiated the lawsuit included theories of trespass, assault, intentional and/or negligent infliction of emotional distress, negligence, and conversion. Paul Smith sought compensation for a loss of services and consortium as a result of injuries sustained by his wife, Cathy. The complaint also sought an award of punitive damages.

After the named defendants received service of process, they filed an answer and counterclaim. The answer, in addition to denying liability, alleged comparative negligence as to Cathy Smith and Jacqueline Holbrook. The counterclaim alleged malicious prosecution as to Ms. Smith and Ms. Holbrook, based upon criminal charges initiated by Ms. Smith against David Witt and Wayne LaRue but subsequently terminated in favor of Witt and LaRue.

The case was set for trial first on March 26, 1992 and then on May 27, 1992. A "final pre-trial memo" in the record indicates that the parties agreed to identify witnesses by May 1, 1992. Videotaped and written depositions of two doctors as experts for the plaintiffs were taken and filed with the court on May 26, 1992.

The case was then continued to a third trial date. On June 19, 1992, counsel for the defendants sent a letter to counsel for the plaintiffs, indicating that defendants desired to have a medical examination of Ms. Smith. Counsel for the plaintiffs refused because discovery had supposedly been completed and the depositions of Ms. Smith's treating physicians had already been taken. On July 21, 1992, the trial court granted an order compelling the physical examination. The examination occurred and the defense doctor was then deposed for purposes of trial testimony.

A jury trial of the pending claims was begun on August 26, 1992.

Wayne LaRue testified that he formerly had been the sales manager at Lifer's John Deere Dealership. His responsibilities included some involvement in repossession, but John Deere did not provide him any training as to repossessions. LaRue indicated that James Reincheld and Edward Holbrook purchased a tractor in February of 1986. Edward Holbrook and Jacqueline Holbrook purchased a bulldozer blade in February of 1989. Each purchase was financed through John Deere Credit Services ("John Deere Credit"). A security interest was perfected as to each item purchased.

Holbrook eventually fell behind on his payments to John Deere Credit. John Deere Credit decided to repossess the equipment. LaRue went out to the Holbrook farm with David Witt of John Deere Credit and Tom Johnston to pick up the tractor and bulldozer blade.

LaRue helped hook the bulldozer blade to a loader tractor to load the blade onto a trailer. Cathy Smith tried to prevent the blade from being taken away by standing on the blade and by telling LaRue not to load it. Cathy and her mother, Jacqueline Holbrook, were both visibly upset at the time.

After the blade was loaded onto the trailer, David Witt got into the tractor to be repossessed and started to load it onto the trailer. Edward Holbrook then arrived back at the farm. " * * * [H]e obviously was very aggravated, and ordered Dave out of the tractor at that time. And then he went up to unload the blade off the tractor/trailer * * *."

David Witt was the area collection manager for John Deere Credit. After two years of dealing with the Holbrooks on what he considered to be delinquent accounts, he decided to repossess the equipment at least until the accounts were brought current. On the evening of May 31, 1990, he went out to the Holbrook farm to repossess the secured items. After conversation with Ed Holbrook, he left and returned the following morning with a tractor-trailer. Upon his return, he was confronted by Jacqueline Holbrook and Ed's sister, Cathy Smith. Inside the tractor to be repossessed was a note from Ed which indicated that taking the tractor would be considered a theft. Cathy told him to leave the property and kept trying to avoid the removal of the bulldozer blade by standing on it. Despite all this, Witt continued to attempt to remove the bulldozer blade and the tractor from the Holbrook farm.

Ed Holbrook testified that he worked the Holbrook farm with other family members, especially his sister, Cathy Smith. He claimed that he had had an unpleasant experience with David Witt before the attempts at repossessing the equipment. Specifically, Holbrook had called Witt's supervisor, Rose Millard, to inform her that he did not want Witt to return to the Holbrook farm. Witt supposedly had seriously upset Ed Holbrook's mother, Jacqueline, who suffered from health problems.

Ed Holbrook claimed that on May 31, 1990, he had told David Witt not to take the equipment but that Witt insisted he was going to take it anyway. Witt supposedly indicated that Holbrook could not prevent the removal of the equipment. Holbrook claimed that he offered to pay off the balance on the bulldozer blade and to pay some toward the tractor, but Witt refused anything but full payment on both. Witt left without the equipment that evening.

Holbrook claimed that he refused Witt permission to pick up the equipment the next day and, to avoid the tractor being taken, he turned the fuel off, locked the door and left a letter indicating that removal of the tractor would be considered theft. He told his mother and sister not to let Witt have the equipment and to let him know if Witt showed up.

Upon being informed the next day that Witt had returned, Holbrook drove from his other employment at the Columbus airport to the farm. He found Witt in the tractor trying to start it. When Holbrook asked Witt to get out of the tractor, Witt refused:

"A.   *   *   * I asked him again, and I was upset and angry, everybody was upset. I asked him a little bit stronger and he still refused, so I asked him again very forcefully to get down, and he finally did.

"Q.   Now, he got off the tractor, and what happened after that?

"A.   I asked them to leave and they refused. I asked them—they wouldn't unload the blade. The blade was already on the trailer. We talked to Mr. Johnston for a while. Mr. LaRue and Mr. Witt talked to each other for awhile.

"Q.   And did you ask them to remove the blade from—

"A.   Yes, I did.

"Q.   —from the truck. Did they do that?

"A.   No.

"Q.   So what did you do?

"A.   I started to—I climbed up on the trailer and started to take the blade off.

"Q.   Then what happened?

"A.   Mr. LaRue stopped me and said that they would take it off.

"Q.   Then what? What happened next?

"A.   They unloaded the blade and finally after some time they left."

Jacqueline Holbrook is Edward Holbrook's mother. She owns the land which is farmed as the Holbrook farm. She testified that her son, Ed, and daughter, Cathy, do most of the farm work on the one hundred sixty-eight acres she owns.

Jacqueline Holbrook is employed primarily as a district nurse with Southwest Licking Schools. She had tried to help her son and daughter with the farm expenses to the point of making payments to John Deere Credit. On one occasion, David Witt had come to the farm to discuss the debts. Holbrook had recently had a close friend die and was already very upset. She insisted that Witt call her son to discuss the problem:

"A. And he just looked at the floor and kept right on talking to me, in a very loud voice, and I kept saying, and I was crying, and I said, 'I can't handle this, you are going to have to talk to Edward.' So then, when Edward came home, I told him, and then he called Rose Millard. The next day I went to the doctor and my blood pressure was up, my heart was skipping beats, and I was having all kinds of trouble."

On the morning of June 1, 1991, she was home when Witt arrived to repossess the tractor and blade. After some discussion of payment, Holbrook claimed:

"A. I said, 'Would you please leave and just leave us alone.'

"Q. And his response was?

"A. No."

Witt returned to his attempts to repossess the equipment. Cathy Smith was then standing on the blade:

"Q. Was she saying or doing anything?

"A. Yes. She told them to get out, that they shouldn't do that, they would be responsible if they hurt her or did any damage.

"Q. Now, what were the children doing?

"A. The children were upset and crying, and my one granddaughter said, 'Granny, take the shotgun out there and chase them off.' I said, 'No, we can't do that.'"

Then, Holbrook positioned herself on the blade:

"A. * * * Cathy is up, her feet are up above my waist and they are pulling this blade towards me. When the blade itself got about this far from me, I thought they're not going to stop and I'm going to have crushed legs, so I stepped aside.

"Q. Where did you go?

"A. I went back up on the porch.

"Q. Then what did you see?

"A. Then I saw the blade keep moving. All of a sudden it went like that. Cathy pitched forward, she was able to land on her feet, and she grabbed her neck and back and said, 'Damn you, you've hurt me.'"

Cathy Smith also testified at trial. She indicated that she is a full-time farmer, working both on the farm where she grew up and on other land in the area. She arrived at the Holbrook farm on May 31, 1991 just as David Witt was leaving. The next day, she was at the farm when David Witt, Tom Johnston and Wayne LaRue arrived.

After discussion of payment, Ms. Smith recalled that she ordered the three men off the property. She later testified that she informed them that they were trespassing and that they would have to return "with papers." She recalled her children as being upset and crying.

Ms. Smith testified that she got on the blade and remained on it:

"A. They got it about three and a half foot in the air, and the hydraulics, Mr. LaRue hit the hydraulic levers on the, I don't know by accident or on purpose, on the loader tractor and it caused the blade to pitch and swing, which caused me to be thrown from the blade.

"Q. What happened to you when you were thrown from the blade?

"A. I landed on my feet in a twisted position. My neck hurt, my head hurt. I later had bruises come out on the back and on my elbow.

"Q. Did you inform them of this?

"A. I immediately grabbed my neck and I said, 'Damn you, you've hurt my neck.' "

Ms. Smith subsequently described her injuries and medical treatment. The depositions of her treating physicians were admitted into evidence, as was the deposition of the defense physician.

After the plaintiffs rested, counsel for the defendants moved for a directed verdict as to all claims. The trial court sustained the motion as to the emotional distress claims on the theory that the evidence did not support the claims. After overruling the motion as to the negligence claim, the trial court sustained the motion as to the trespass claim on the theory that the owner of the property had suffered no injury as a result of the trespass " * * * even if we take the theory of the trespass being part and parcel of damages to Cathy Smith."

The conversion claim was ordered to be dismissed on a theory that Edward Holbrook was the owner of the equipment and he was not a party to the lawsuit but, after reviewing the exhibits, the trial court reversed itself on the conversion theory. The services and consortium claim was ordered dismissed for reasons which the trial judge did not explain.

The trial court ordered the assault claim to be dismissed because: "I don't think that any reasonable jury construing the evidence most strongly in behalf of the Plaintiff could find that there was an intentional act claimed." As a result, the trial court decided to submit the case to the jury only on negligence and conversion theories.

After the defense presented its witnesses, Cathy Smith testified on rebuttal about the circumstances surrounding the filing of criminal charges. The trial court then also directed a verdict on the counterclaim, directed a finding that the

defendants were negligent, and directed a finding that Cathy Smith was also negligent. The trial court did not submit the issue of punitive damages to the jury.

The jury returned a verdict in favor of Jacqueline Holbrook for $150 on the conversion theory. The jury then returned a verdict in the sum of $5,000 for the injuries to Cathy Smith but found her to be thirty percent responsible on a theory of comparative negligence. Thus, her award was reduced to $3,500.

After the verdicts were returned in open court, plaintiffs filed a motion asking that the directed verdicts be "reconsidered." The trial court overruled the motion.

Plaintiffs (hereinafter "appellants") have now appealed, assigning five errors for our consideration:

"I. The trial court erred in directing a verdict in favor of defendants on plaintiffs' claim of assault.

"II. The trial court erred in directing a verdict in favor of defendants on plaintiffs' claim of trespass.

"III. The trial court erred in directing a verdict in favor of defendants on plaintiffs' claim for punitive damages.

"IV. The trial court erred in instructing the jury that Cathy Smith was comparatively negligent.

"V. The trial court erred in allowing the expert testimony of defendants' doctor."

The defendants (hereinafter "appellees") have submitted the following cross-assignments of error:

"1. The trial court erred in directing a verdict in favor of appellants on appellees' claim for malicious prosecution.

"2. The trial court erred in directing the jury that appellees were negligent."

As to directed verdicts generally, Civ.R. 50(A)(4) governs. The rule states:

"When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

In discussing a motion for a directed verdict, the Supreme Court of Ohio has stated:

" \* \* \* [W]hat is being tested is a question of law; that is, the legal sufficiency of the evidence to take the case to the jury. This does not involve weighing the evidence or trying the credibility of witnesses; it is in the nature of a demurrer to the evidence and assumes the truth of the evidence supporting the facts essential to the claim of the party against whom the motion is directed, and gives to that party the benefit of all reasonable inferences from that evidence. The evidence is granted its most favorable interpretation and is considered as establishing every material fact it tends to prove \* \* \*." *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 68–69, 23 O.O.3d 115, 116, 430 N.E.2d 935, 938.

In *O'Day v. Webb* (1972), 29 Ohio St.2d 215, 58 O.O.2d 424, 280 N.E.2d 896, paragraph four of the syllabus, the Supreme Court of Ohio stated:

"It is the duty of a trial court to submit an essential issue to the jury when there *is* sufficient evidence relating to that issue to permit reasonable minds to reach different conclusions on that issue \* \* \*." (Emphasis *sic.*)

Turning to the individual theories upon which the trial court directed a verdict, the tort of assault is defined as the willful threat or attempt to harm or touch another offensively, which threat or attempt reasonably places the other in fear of such contact. The threat or attempt must be coupled with a definitive act by one who has the apparent ability to do the harm or to commit the offensive touching. An essential element of the tort of assault is that the actor knew with substantial certainty that his or her act would bring about harmful or offensive contact. See *Scott v. Perkins* (App.1975), 74 O.O.2d 280.

At common law, the tort of assault was clearly distinguished and distinguishable from the tort of battery, which was the actual harmful and/or offensive physical contact.

The trial court was correct in directing a verdict as to the tort of assault but for the wrong reason. The testimony, appropriately construed in favor of Ms. Smith, would allow a finding that the act of knocking her off the bulldozer blade was intentional. Her acknowledgement that she did not personally know the exact mental state of the person who had physical contact with the controls would not prevent a jury from inferring that the moving of the blade was intentional. However, at no time did Ms. Smith indicate that she was afraid of some sort of physical contact. Her clear emotion throughout the encounter with the agents of John Deere was that of rage, not fear. Further, no threat was uttered. As a result, the tort of assault was not proven. Appellants' first assignment of error is therefore overruled.

Appellants' second and third assignments of error are sustained. A reasonable trier of fact could find that the agents of John Deere were trespassers

under the circumstances and that their conduct was sufficiently egregious to warrant punitive damages.

The Supreme Court of Ohio has held:

"Where a creditor legally enters upon the private premises of his debtor for the purpose of repossessing collateral security kept thereon and is (1) physically confronted by one in charge of such premises, (2) told to desist his efforts at repossession, and (3) instructed to depart from the premises, the refusal by the creditor to heed such commands constitutes a breach of the peace * * * and such creditor thereafter stands as would any other person who unlawfully refuses to depart from the land of another." *Morris v. First Natl. Bank & Trust Co.* (1970), 21 Ohio St.2d 25, 50 O.O.2d 47, 254 N.E.2d 683, paragraph five of the syllabus.

In *Baker v. Shymkiv* (1983), 6 Ohio St.3d 151, 153, 6 OBR 206, 208, 451 N.E.2d 811, 814, the Supreme Court of Ohio stated:

" * * * 'A trespass on land subjects the trespasser to liability for physical harm *to the possessor* of the land at the time of the trespass, or to the land or to his things, or to members of his household or to their things, caused by any act done, activity carried on, or condition created by the trespasser, irrespective of whether his conduct is such as would subject him to liability were he not a trespasser.' * * * " (Emphasis added.) Quoting Restatement of Torts 2d 277, Section 162.

The fact that Cathy Smith was physically injured during the trespass yet Jacqueline Holbrook was the owner of the premises is immaterial. Trespass is an invasion of the *possessory* interest in property and not an invasion of title. See *State v. Herder* (1979), 65 Ohio App.2d 70, 19 O.O.3d 47, 415 N.E.2d 1000; *Northfield Park Associates v. Northeast Ohio Harness* (1987), 36 Ohio App.3d 14, 521 N.E.2d 466; and *State v. Herrin* (1982), 6 Ohio App.3d 68, 6 OBR 535, 453 N.E.2d 1104. Cathy Smith had a possessory interest in the farm. She operated the farm, financially supported the farming business, and derived income from the farm. She worked on the farm every day and was present on the day of the attempted repossession. Under the circumstances, the agents of John Deere could be found to be liable for the physical harm they caused her on a trespass theory. Obviously, under such a theory they were not entitled to an offset for comparative negligence.

The Supreme Court of Ohio has defined "actual malice" for purposes of punitive damages in *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174. The syllabus reads:

"Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit

of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." (Emphasis *sic.*)

A trier of fact could find that raising and moving the blade with Ms. Smith standing on it involved a conscious disregard for the rights and safety of Ms. Smith that had a great probability of causing substantial harm. Such a trier of fact could decide that punitive damages were appropriate. Therefore, as indicated above, the second and third assignments of error are sustained.

■ Appellants' fourth assignment of error and appellees' second cross-assignment are error are also sustained. The party who risks having personal property removed by "self-help" repossession has a right to threaten a breach of the peace in order to prevent the removal of the property. Likewise, a party with a perfected security interest has a right to take possession of the property if the repossession can be accomplished without a threat of a breach of the peace. R.C. 1309.46 provides, in pertinent part:

"Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action."

The evidence here was sufficiently conflicting that a directed verdict as to negligence as to any party was inappropriate.

Since the judgment below will be vacated and the cause remanded for a new trial as a result of our treatment of the appellants' second, third and fourth assignments of error, and appellees' second cross-assignment of error, appellants' fifth assignment of error is moot. See App.R. 12. However, a trial court should look with a jaundiced eye upon any party who waits until the opposing party's experts have given trial testimony by way of deposition before seeking to develop its own expert testimony. The trial court here would have been well within its rights to continue the trial date and award expert and attorney fees to appellants so that new trial depositions could be conducted because of the delay of the appellees in developing their expert medical testimony. The trial court would also have been within its rights to simply refuse the physical examination. The trial judge who will be assigned this case on remand will have to determine what, if any, remedy is necessary to cure the problems caused by the delay here.

■ The last assignment of error is appellees' cross-assignment of error attacking the directed verdict as to the malicious prosecution theory contained in the counterclaim. Construing the evidence most strongly in favor of the appellees, we cannot say that Cathy Smith lacked probable cause to institute criminal charges of trespass and assault.

R.C. 2911.21(A)(1) and (4) set forth two theories of trespass for which Ms. Smith had probable cause. They read:

"(A) No person, without privilege to so, shall do any of the following:

"(1) Knowingly enter or remain on the land or premises of another;

" \* \* \*

"(4) Being on the land or premises of another, negligently fail or refuse to leave upon being notified to do so by the owner or occupant, or the agent or servant of either."

Assault, for criminal law purposes, is set forth in R.C. 2903.13(A) and (B), which read:

"(A) No person shall knowingly cause or attempt to cause physical harm to another.

"(B) No person shall recklessly cause serious physical harm to another."

"Knowingly," for purposes of criminal statutes, is defined in R.C. 2901.22(B) as follows:

"A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."

Since Ms. Smith had probable cause to file the charges, a directed verdict on her behalf and on her mother's behalf was appropriate.

In summary, appellants' second, third and fourth assignments of error are sustained. Their first assignment of error is overruled. We do not decide their fifth assignment of error since it is moot in light of our disposition of the second, third and fourth assignments of error. See App.R. 12.

Appellees' first cross-assignment of error is overruled, and their second cross-assignment of error is sustained.

The judgment of the Franklin County Court of Common Pleas is reversed and the cause remanded for a new trial consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

PETREE and MARTIN, JJ., concur.

WILLIAM J. MARTIN, J., of the Carroll County Court of Common Pleas, sitting by assignment.