[Cite as *Hilgefort v. Stewart*, 2011-Ohio-253.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SHELBY COUNTY

MICHAEL HILGEFORT,

    PLAINTIFF-APPELLEE,                   CASE NO. 17-10-13

    v.

RAYMOND STEWART,                   O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Shelby County Common Pleas Court
Trial Court No. 07CV000457

**Judgment Affirmed**

**Date of Decision: January 24, 2011**

APPEARANCES:

    *Kimberly S. Kislig* for Appellant

    *Timothy S. Sell* for Appellee

PRESTON, J.

**{¶1}** Defendant-appellant, Raymond Stewart, appeals the Shelby County Court of Common Pleas' judgment finding him civilly liable for an assault and battery upon the plaintiff-appellee, Michael Hilgefort. We affirm.

**{¶2}** On December 28, 2007, Hilgefort filed a complaint alleging that, on November 21, 2007 at the Moose Lodge in Sidney, Ohio, Stewart committed assault and battery against him by picking him up in the air and slamming him to the floor with great force and violence. (Doc. No. 1, ¶1). Hilgefort alleged that he sustained injuries, including a dislocated elbow, as a result of Stewart's tortious conduct. (Id. at ¶2). Hilgefort sought compensatory damages of $25,000, punitive damages of $75,000, reasonable attorney fees, costs of the proceedings, and any other relief the trial court deemed equitable. (Id. at ¶5).

**{¶3}** On January 25, 2008, Stewart filed an answer denying the allegations in the complaint, asserting several affirmative defenses, including self-defense, and asserting a counter-claim of assault against Hilgefort. (Doc. No. 7).

**{¶4}** On February 11, 2008, Hilgefort filed a reply denying Stewart's counter-claim allegations. (Doc. No. 11).

**{¶5}** On September 8, 2008, Stewart filed a motion to bifurcate the issue of punitive damages pursuant to R.C. 2315.21(B)(1). (Doc. No. 54). The trial court granted the motion to bifurcate on October 8, 2008. (Doc. No. 63).

**{¶6}** On October 22, 2009, the matter proceeded to a bench trial, and the trial court found Stewart civilly liable to Hilgefort for assault and battery, awarding Hilgefort $20,000.00 in compensatory damages. (Doc. No. 106). On February 5, 2010, the trial court filed its findings of fact and conclusions of law. (Doc. No. 117).

**{¶7}** On February 3, 2010, Stewart filed a motion for summary judgment on the issue of punitive damages. (Doc. No. 116). On February 23, 2010, Hilgefort filed a memorandum in opposition. (Doc. No. 120). On March 8, 2010, the trial court granted Stewart summary judgment on the issue of punitive damages. (Doc. No. 121).

**{¶8}** On April 7, 2010, Stewart filed a notice of appeal. (Doc. No. 126). Stewart now appeals raising four assignments of error for our review. We elect to combine Stewart's first, second, and fourth assignments of error for discussion.

**ASSIGNMENT OF ERROR NO. I**

**THE TRIAL COURT ERRED WHEN IT HELD THAT DEFENDANT-APPELLANT ("RAYMOND") COMMITTED ASSAULT AND BATTERY AGAINST THE PLAINTIFF-APPELLANT ("HILGEFORT") BECAUSE RAYMOND DID NOT INTEND TO INJURE HILGEFORT.**

**ASSIGNMENT OF ERROR NO. II**

**THE TRIAL COURT ERRED WHEN IT HELD THAT RAYMOND DID NOT ACT IN SELF-DEFENSE WHEN RAYMOND WAS NOT AT FAULT FOR CREATING THE SITUATION AND RAYMOND HAD AN HONEST BELIEF**

**THAT HE WAS IN IMMEDIATE DANGER OF BODILY HARM.**

**ASSIGNMENT OF ERROR NO. IV**

**THE TRIAL COURT ERRED WHEN IT HELD THAT HILGEFORT DID NOT ASSAULT RAYMOND BECAUSE HILGEFORT DID PLACE RAYMOND IN FEAR OF PHYSICAL HARM.**

{¶9} In his first assignment of error, Stewart argues that the trial court erred by finding that he committed assault and battery against Hilgefort, because he did not intend to harm Hilgefort but only "to keep [Hilgefort] from further harming himself." Stewart argues that his intent was not to injure Hilgefort but to merely "subdue him" because of the uncomfortable situation.

{¶10} In his second assignment of error, Stewart argues that the trial court erred by failing to find he acted in self-defense since Hilgefort created the situation by approaching him, smacking his hands on the table, and yelling profanity at him.

{¶11} In his fourth assignment of error, Stewart argues that the trial court erred in failing to find that Hilgefort assaulted him when Hilgefort placed his hands near Stewart's face while yelling profanity at him.

{¶12} An assault in tort is "'the willful threat or attempt to harm or touch another offensively, which threat or attempt reasonably places the other in fear of such contact.'" *Retterer v. Whirlpool Corp.* (1996), 111 Ohio App.3d 847, 854,

677 N.E.2d 417, abrogated on other grounds, quoting *Smith v. John Deere Co.* (1993), 83 Ohio App.3d 398, 406, 614 N.E.2d 1148. A key element of assault is that the alleged tortfeasor "knew with substantial certainty that his or her act would bring about harmful or offensive contact." Id. Battery results when an individual "acts intending to cause a harmful or offensive contact, and when a harmful contact results." *Love v. Port Clinton* (1988), 37 Ohio St.3d 98, 99, 524 N.E.2d 166. To constitute offensive contact, the contact must be "offensive to a reasonable sense of personal dignity." Id.

{¶13} "'[T]he elements of self-defense where the defendant is only alleged to have used non-deadly force are: (1) the defendant was not at fault in creating the situation giving rise to the affray, and (2) the defendant (even if mistaken) had a bona fide belief (which means a belief that was both objectively reasonable and subjectively honest) that he was in imminent danger of any bodily harm (whether it be deadly or non-deadly).'" *Struthers v. Williams*, 7th Dist. No. 07 MA 55, 2008-Ohio-6637, ¶15, quoting *State v. Morris*, 7th Dist. No. 03MO12, 2004-Ohio-6810, at ¶21. See, also, *State v. Densmore*, 3d Dist. No. 7-08-04, 2009-Ohio-6870, ¶26; 2 OJI-CR 417.27.

{¶14} "A defendant who only used non-deadly force to defend himself need not fear death or great bodily harm in order to use non-deadly force in self-defense." *Williams* at ¶16, citing *In re Morton,* 7th Dist. No. 01-BA-29, 2002-

Ohio-2648, ¶23. Rather, the defense still applies if the force used was reasonable under the circumstances to protect one-self. Id. Furthermore, there is no duty to retreat before using non-deadly force in self-defense like in deadly force cases. *Williams*, 2008-Ohio-6637, at ¶16, citing *Morton* at ¶25. Self-defense, however, is inappropriate if the force used is "so grossly disproportionate as to show revenge or as criminal purpose." *State v. Hendrickson*, 4th Dist. No. 08CA12, 2009-Ohio-4416, ¶33, citing *State v. Nichols*, 4th Dist. No. 01CA2775, 2002-Ohio-415. See, also, 2 OJI-CR 421.23.

**{¶15}** In civil cases, "judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, at syllabus. See, also, *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶24; *Reinhardt v. Fostoria Plumbing, Heating, & Elec. Supply, Inc.*, 3d Dist. No. 13-10-08, 2010-Ohio-4825, ¶15. When applying this standard, we must "presume that the findings of the trier of fact are correct" since "the trial judge had an opportunity 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.'" *Wilson*, 2007-Ohio-2202, at ¶24, quoting *Seasons Coal Co., Inc. v. Cleveland* (1984), 10 Ohio St.3d 77, 80-81, 461 N.E.2d 1273. Reversal based on

an error of law is legitimate; however, the trial court's decision should not be reversed based on a "difference of opinion on credibility of witnesses and evidence * * *." Id., quoting *Seasons Coal*, 10 Ohio St.3d at 81; *Knipp v. Sadler*, 3d Dist. No. 6-09-04, 2009-Ohio-4444, ¶7.

{¶16} At trial, Michael Hilgefort testified that he was employed as a bartender at the Sidney Moose Lodge on November 21, 2007. (Oct. 22, 2009 Tr. at 20-21). He testified that lodge members and their guests are required to wear proper attire, which requires men to wear their hats "straight," i.e. with the bill forward. (Id. at 21-23). Hilgefort indentified plaintiff's exhibit 1-1 as the social quarter rules and regulations that are posted in the lodge, and he testified that lodge employees are expected to enforce these rules. (Id. at 23, 25); (Plaintiff's Ex. 1-1). He testified that Jackie Blakely and Connie Baker were bartending with him on the evening of November 21, 2007. (Id. at 24-25). Hilgefort testified that he observed Stewart approach the bar with his hat turned backwards and order a beer from Connie. (Id. at 26). Connie asked Stewart to turn his hat around, and Stewart reluctantly complied. (Id. at 27). Hilgefort testified that he later saw Stewart sitting at a table with lodge members Rob Thorne and Corey Shreves with his hat turned backwards. (Id. at 26, 28). Hilgefort testified that, as he was taking a beer to another table, he asked Stewart to turn his hat around, but Stewart left his hat on backwards. (Id. at 28). Hilgefort testified that he returned to the same table

with another drink moments later and asked Stewart again to turn his hat around, but Stewart ignored him and looked away. (Id.). After Hilgefort dropped off the drink, he returned to Stewart's table and again asked him to turn his hat around and told Stewart that he would have to leave if he did not turn his hat around. (Id. at 29). Hilgefort testified that two or three people sitting at the table asked Stewart to turn his hat around, but Stewart refused. (Id.). At this point, Hilgefort told Stewart that "he'd have to get the hell out of here," but Stewart continued to ignore him, even though he had lifted his voice. (Id.). At that point, Hilgefort told Stewart "to get the F out of [here]," after which Stewart stood up and told Hilgefort if he wanted his hat turned around he would have to turn it around for him. (Id. at 30). Hilgefort told Stewart "it wasn't [Hilgefort's] damned hat, that it was his hat, and it was his responsibility to turn it around." (Id.). According to Hilgefort, Stewart then "picked [him] up and threw [him] on the ground." (Id.). Hilgefort testified that he remembered his right hand was behind his back, he was on the floor, and Stewart was pushing his head against the floor. (Id. at 30-31). Lodge patrons pulled Stewart off of Hilgefort. (Id. at 31). Hilgefort further testified that he was about five feet ten and one-half inches (5' 10½") tall and weighed about one hundred eighty-five (185) pounds. (Id.). Hilgefort denied throwing any punches at Stewart, threatening Stewart, or approaching Stewart in a physical manner. (Id. at 31-32). Hilgefort testified that he raised his voice to

Stewart and used offensive language to get Stewart's attention because "[i]n the years dealing with people that's been drinkin', sometimes you gotta raise your voice to get their attention." (Id. at 32).

{¶17} Hilgefort testified that Stewart caused serious pain to his arm—on a scale of one to ten, with ten being the highest, a "level ten" of pain. (Id. at 33). Hilgefort testified that he saw his family physician, who happened to be at the lodge that night, and he recommended that Hilgefort go to the hospital because his arm could be broken or dislocated. (Id.). When Hilgefort arrived at the hospital, the doctors gave him some pain medication and preformed a reduction to re-set his dislocated elbow. (Id. at 35-36). Hilgefort testified that he followed-up with Dr. Stover upon his release from the hospital, and Dr. Stover recommended physical therapy. (Id. at 37-38). Hilgefort testified that he visited Dr. Stover four to five (4-5) times and did six to eight (6-8) weeks of physical therapy. (Id. at 38). Hilgefort testified that he was in severe pain during the first three weeks of physical therapy, and the pain level dropped to a seven or eight after that. (Id. at 39). Hilgefort testified that his right elbow was injured and he was right-handed, and he could not lift anything heavier than a gallon milk jug for several weeks, which affected his employment. (Id. at 40-41). Hilgefort testified that his arm felt pretty good now, though once or twice a week his elbow was stiff for a couple of hours when he first woke up, and once in a while his elbow would "pop" when he was lifting

something above his head. (Id. at 42-43). Hilgefort testified that he lost over fifty (50) hours of work due to his injuries. (Id. at 45). He further testified that he makes $7.36 per hour plus tips, which average about fifty to sixty dollars ($50-$60) per day. (Id.). Hilgefort testified that his medical bills were paid through workers' compensation, and he was not asking for any money for the medical bills. (Id. at 46-47).

{¶18} On cross-examination, Hilgefort testified that the Moose Lodge rules are posted on the front board and again at the bottom of the stairs. (Id. at 48). Hilgefort testified that Stewart was not a member of the lodge, and he was not sure whether Stewart knew about the rules. (Id.). Hilgefort denied ever having trouble with other lodge patrons over the rules but admitted that he has enforced the rules even when he was not on duty. (Id. at 49-50). Hilgefort admitted that he was prescribed Lexapro for depression, but denied drinking any alcohol the night of the incident. (Id. at 50-51). Later Hilgefort testified that he did have one half of a mixed drink after the incident to help calm himself down and help ease the pain. (Id. at 54). Hilgefort testified that he did not take an ambulance to the hospital because he did not want to pay for it. (Id. at 55). Hilgefort also testified that he thought that Stewart heard him ask him to remove his hat since several other persons at the table heard his request. (Id.). Hilgefort testified that Dr. Stover told him he could return to work with limitations in a day or two. (Id. at 57). Hilgefort

testified that he lost an estimated three hundred dollars ($300.00) in tips due to missing work. (Id. at 58).

{¶19} Robert Thorne testified that he was a member of the Moose Lodge, and he knew about the rule prohibiting men in the lodge from wearing their hats backwards. (Id. at 61-62). Thorne testified that he knew Hilgefort and that Stewart has been his friend since 1987 or 1988. (Id. at 62). Thorne testified that Stewart did not usually get into bar fights. (Id. at 62-63). Thorne testified that Stewart sat at his table when he came into the lodge, and he thought Stewart had two beers before the incident occurred. (Id. at 63). Thorne was not aware of whether Hilgefort had asked Stewart to turn his hat around a few times. (Id. at 64). Thorne testified that he saw Hilgefort leaning over and yelling at Stewart, "turn your F-in' hat, I told you to turn your F-in' hat around." (Id.). Thorne testified that Hilgefort was so loud that everyone in the bar stopped and looked to see what was happening. (Id. at 65). Thorne testified that Hilgefort's hands were on the table "and then he put his finger up and said I told you to turn your F-in' hat around." (Id.). Thorne testified that Hilgefort put his finger in Stewart's face when Stewart stood up. (Id.). He also testified that he had never seen Hilgefort act like that in the lodge before. (Id.). Thorne testified that Stewart "wrapped" Hilgefort up and took him to the ground after Hilgefort put his finger in Stewart's face. (Id. at 66). When asked if he thought Stewart was trying to hurt Hilgefort, Thorne testified,

"[n]o. I don't think – if he was trying to hurt him, I think he would have swung at him, took a punch at him." (Id. at 67). When asked what he thought Stewart was trying to do, Thorne testified, "[s]ubdue him or – I don't know. I can't –it's kind of – I'm not sure what was going through his head. I don't – I think he may have been uncomfortable with the situation and – and he reacted in the way that he – he felt was appropriate." (Id.). When asked if he would have felt threatened by Hilgefort, Thorne testified, "I would have probably been a little bit threatened by that act." (Id.).

{¶20} On cross-examination, Thorne testified that he met Stewart at the YMCA in town, and that he used to lift weights with Stewart. (Id. at 68). Thorne testified that Stewart was a casual "off and on" friend who he would "see here and there." (Id. at 69). Thorne testified that he talked with Stewart about the lodge incident about four or five times before testifying. (Id. at 71). Thorne did not know how long Stewart had been at the lodge before he arrived or how much Stewart had had to drink that night. (Id. at 71-72). Thorne further testified that, at the time of the incident, Stewart was seated at a different table than he, and he was engaged in a conversation with other lodge members. (Id. at 75). Thorne did not know whether Hilgefort had asked Stewart to turn his hat around earlier that night, and he did not advise Stewart to turn his hat around either. (Id. at 76). Thorne

agreed that Stewart was much larger than Hilgefort. (Id. at 77). When asked about

whether Hilgefort had his finger in Stewart's face, Thorne testified as follows:

**Q: And your testimony is that [Hilgefort] had his finger on – in Mr. Stewart's face while he was seated, is that correct?**

**A: He leaned in, he yelled at him, and he said I told you to take your F-in' hat off.**

**Q: Okay.**

**A: And Raymond stood up at that point.**

**Q: And –and then tackled [Hilgefort]?**

**A: Correct.**

**Q: Correct?**

**A: (Witness nods head in the affirmative)**

**Q: So when Mr. Stewart stood up, there was no longer a finger in the face?**

**A: The finger was in his face when he stood up and then he tackled him.**

**Q: The finger was in his face as he was standing up?**

**A: Yes.**

**Q: Okay. And then once he stood up – [Hilgefort] didn't have his finger in his face once Mr. Stewart stood up, did he?**

**A: He leaned in and yelled, and then [Stewart] stood up and [Hilgefort] said I told you to turn your F-in' hat around, and that's when it happened.**

**Q: So I thought – I thought the finger was in the face while he was still seated there?**

**A: No.**

**Q: It was when he stood up?**

**A: When he stood up. He leaned in and yelled at him.**

**Q: All right. And so [Hilgefort] pointed his finger at him and said I told you to take your F-in' hat off, is that correct?**

**A: Right.**

**Q: Or turn it around?**

**A: Right.**

**Q: And in response to that, Mr. Stewart took [Hilgefort] to the ground?**

**A: Correct.**

(Id. at 77-79). Thorne did not see Stewart or Hilgefort throw any punches, and Thorne did not know whether Stewart became violent when he drank alcohol. (Id. at 79-80). On re-direct examination, Thorne testified that he was approximately eight feet from the incident when it occurred. (Id. at 84). Thorne further testified that Stewart was never violent when he drank alcohol before. (Id.).

**{¶21}** Robert Guillozet testified that he was at the Moose Lodge the night of November 21, 2007. (Id. at 85-87). Guillozet testified that he saw Stewart sitting at a table "partyin' and havin' shots." (Id. at 88). Guillozet testified that, later in the evening, he went up to the bar to get a couple drinks and was standing there talking with Doc, when he heard Hilgefort say something about telling a guy to turn his hat around. (Id. at 90). Guillozet testified that he saw Stewart grab Hilgefort by the arm and they both went down to the ground. (Id.). Guillozet testified that he did not see Stewart stand up, but saw him already standing facing Hilgefort, and it looked like the two were talking. (Id. at 91). He did not see Hilgefort make any gestures towards Stewart's face. (Id. at 92). When asked what Stewart did to Hilgefort, Guillozet testified, "* * * they were standin' facin' each other; and as I recall, [Stewart] had both hands, one on each side of [Hilgefort's] arm; and then the next thing I know, they were down and out of sight." (Id.). On cross-examination, Guillozet testified that he had two or three beers that night, and did not recall seeing Hilgefort drinking. (Id. at 94).

**{¶22}** Detective Scott White of the Sidney Police Department testified that he received a call around 11:34 p.m. the evening of November 21, 2007 concerning a disturbance at the Moose Lodge. (Id. at 95-96). Detective White testified that he obtained a statement from Hilgefort and a description of the suspect who had fled the scene. (Id. at 97). Detective White and Officer Baker went to Stewart's home and knocked on the door, but no one answered the door. (Id. at 98). Detective White testified that he noticed wet footprints on the porch, and that they could hear someone inside the home, though they did not know who it was. (Id.). Detective White testified that it was raining or snowing that night, and that it appeared that someone had just entered the home prior to them arriving. (Id. at 99). Detective White testified that they arrived at Stewart's home at 12:09 a.m. (Id.). On cross-examination, Detective White testified that he did not identify himself as a police officer when he knocked on Stewart's door. (Id. at 100). He further testified that they asked Hilgefort if he wanted a medic to transport him to the hospital, but Hilgefort indicated that he would have someone take him. (Id. at 102). Detective White did not take pictures of Hilgefort's injured elbow. (Id.). On re-direct, Detective White testified that none of the witness statements were inconsistent with what Hilgefort indicated had happened that night. (Id. at 104). He also indicated that none of the witnesses he talked with stated that Stewart acted in self-defense. (Id.). He further testified that he learned through his

investigation that Stewart fled out the back door and ran south through the golf course after the incident. (Id. at 105).

**{¶23}** Jeffery Westover testified that he was at the Moose Lodge on the evening of November 21, 2007 with his fiancée Deb Holthaus. (Id. at 110-11). Westover testified that he was sitting at the bar straight across and a little to the right of where the incident took place that night. (Id. at 111). Westover testified that he did not see Hilgefort make any intimidating gestures toward Stewart, though Hilgefort may have pointed toward the door. (Id. at 112). Westover testified that the two men "weren't face-to-face very long and then, all of a sudden, [Stewart] got him around the neck and took his feet out from under him and they just went out of sight, down below the table line." (Id.). Westover testified that he then went around the bar and they were both off of the floor by that time, and he saw Stewart heading towards the back door. (Id. at 113). On cross-examination, Westover denied ever being barred from the lodge, though he admitted his brother had been barred about three times. (Id. at 114). Westover denied that his brother or he had ever been barred from the lodge for fighting with Hilgefort. (Id.). Westover testified that it was crowded in the lodge that night and loud, so he could not hear what was being said between Hilgefort and Stewart. (Id. at 118). Westover testified that Hilgefort and Stewart's faces were as close as six to eight inches apart when they were standing facing each other and that they both

appeared angry. (Id.). Westover further testified that there was a rule prohibiting profanity, and the rule applied to lodge employees as well. (Id. at 119). He further testified that employees were not allowed to consume alcohol while working, and he had seen Hilgefort drinking while he was working but could not say whether it was an alcoholic drink or not. (Id. at 120).

{¶24} Jackie Blakely testified that she was employed as a bartender and waitress at the Moose Lodge and works with Hilgefort. (Id. at 126-27). She testified that she was responsible for enforcing the lodge rules as a bartender and waitress at the lodge. (Id. at 127). She testified that she was bartending the evening of November 21, 2007, along with Hilgefort and Connie Baker, the manager. (Id. at 128). Blakely testified that, earlier in the evening before the incident, Connie asked Stewart to turn his hat around. (Id. at 129). According to Blakely, Stewart turned his hat around at first but later turned his hat around backwards again. (Id.). Blakely testified that she saw Stewart and Hilgefort about two to three inches apart and then the two of them were on the ground. (Id. at 130). Blakely testified that she did not observe Hilgefort shove, swing, raise a hand, or point a finger at Stewart. (Id.). Blakely testified that after several people pulled Stewart off of Hilgefort, Stewart ran out the back door. (Id. at 131). On cross-examination, Blakely testified that she did not hear the conversation between Hilgefort and Stewart because it was loud in the lodge. (Id. at 134). She testified

that she did not know whether Hilgefort was drinking alcohol that night while working, though she has seen him drink alcohol while working before. (Id. at 135).

{¶25} After Blakely testified, plaintiff offered into testimony the video deposition of Dr. Stover and offered into evidence the exhibits that Dr. Stover referenced at his deposition. (Id. at 136). Dr. Stover testified that he has been a practicing orthopedic surgeon since 1987. (Stover Depo. at 3-4). Dr. Stover testified that he first saw Hilgefort on November 23, 2007 after Hilgefort had sustained a dislocated elbow at his place of employment. (Id. at 5-6). Dr. Stover testified that he prescribed Hilgefort Motrin for pain. (Id. at 8). He testified that Hilgefort followed-up with his office seven or eight times, until Hilgefort was released from his care on July 16, 2008. (Id. at 11). Dr. Stover testified that, based upon his examination and training, the November 21, 2007 incident caused Hilgefort's dislocated elbow. (Id. at 12-13). Dr. Stover testified that he prescribed physical therapy for Hilgefort as well. (Id. at 14). He further testified that Hilgefort lacked the ability to extend his elbow fully, which was a permanent injury. (Id.). Dr. Stover testified that Hilgefort may have some future discomfort and pain intermittently in the elbow. (Id. at 15). Dr. Stover testified that it is possible that Hilgefort will experience arthritis, stiffness, and loss of motion in his elbow as a result of his injury. (Id. at 16).

{¶26} Thereafter, the plaintiff rested, and the defense presented the testimony of three witnesses. (Id. at 140-41). Stewart testified that he went to the lodge with some friends on November 21, 2007. (Id. at 141). He testified that he was not a lodge member, he was not familiar with the lodge rules, and he did not see the rules posted in the lodge. (Id. at 141-43). Stewart testified that he entered the lodge between 9:30 and 10:00 p.m. in the evening and sat with Rob and Steve Thorne. (Id. at 143). He testified that he had two beers that evening, and he was not intoxicated that night. (Id. at 143-44). Stewart testified that, when he walked up to the bar to buy a round of beers for the table, Connie asked him to turn his hat around, so he did. (Id. at 144). Stewart testified that after he sat down at the table he must have turned his hat back around "subconsciously" because he always wears his hats backwards since it was a "bad habit." (Id.). He testified that he did not purposely turn his hat around backwards to break the lodge rules, and he noticed several other younger guys in the lodge with their hats on backwards. (Id. at 145). Stewart testified that the first time Hilgefort asked him to turn his hat around he told him that there were other guys in the lodge with their hats on backwards, and he should have them turn their hats around as well. (Id.). After that, Hilgefort screamed at the top of his lungs three times to turn his "F-in' hat around," smacking his hands on the table, according to Stewart. (Id.). Stewart testified that he felt threatened by Hilgefort's screaming, and Hilgefort was three

or four inches from him when he was screaming at him. (Id. at 146). Stewart further testified that Hilgefort was "makin' a gesture towards my hat or my hair or my, you know, my face" when he was screaming at him. (Id.). Stewart testified that, at that time, he grabbed Hilgefort by the arm and underneath the armpit, and put Hilgefort on the ground. (Id. at 146-47). Stewart testified that he did not intend to hurt Hilgefort but wanted to "keep him from hurt – further harming himself." (Id. at 147). Stewart testified that after the incident, he ran home in the pouring down rain. (Id. at 148). Stewart testified that he did not recall a knock at the door of his home that night, and he did not know the police were outside of his door at any time. (Id. at 149). Stewart testified that a neighbor informed him that the police were at his house that night, so he called the police department. (Id. at 149-50). Stewart insisted that he did not intend to hurt Hilgefort, only to subdue him. (Id. at 150). He admitted that he pled guilty to a criminal assault charge for the incident because he did not want to risk having a felony record since he served in the military. (Id. at 151). Stewart testified that he would probably react the same today as he did at the time of the incident because he felt threatened, but he was sorry that Hilgefort was injured. (Id. at 151).

**{¶27}** On cross-examination, Stewart testified that he was six foot one inch (6'1") tall and weighed about two hundred twenty eight (228) pounds at the time of the incident. (Id. at 152). Stewart testified that he does lift weights but

- 20 -

primarily does cardio work outs since he is older. (Id.). Stewart testified that he was at the lodge to drink and meet up with friends. (Id. at 155). Stewart testified that he was alone at the table when the incident occurred because his wife and her friend were outside smoking. (Id. at 158). Stewart also testified that Connie never told him about the lodge rules when she asked him to turn around his hat. (Id.). Stewart denied that other people at the table told him to turn his hat around and that Hilgefort ever told him to leave. (Id. at 161-62). Stewart denied being angry with Hilgefort when he stood up, and testified that he stood up to face Hilgefort because he felt threatened. (Id. at 166). Stewart testified that Hilgefort did not swing at him or threaten him with physical harm. (Id. at 169). Stewart testified that, while he was outside in the parking lot after the incident, Jackie told him that the police had been called. (Id. at 173-74). On re-direct, Stewart again testified that he felt like he was defending himself against Hilgefort. (Id. at 189).

{¶28} Steve Thorne, a lodge member present the night of the incident, testified that he has been friends with Stewart since the mid-to-late 1980's and has never known him to fight with others. (Id. at 191-92). Thorne testified that he thought Stewart had one or two beers that night, and that he was seated at the table when Hilgefort approached Stewart. (Id. at 192-93). Thorne testified that "[Hilgefort] put his hands on the table and said something. I was talking to Rob. He said somethin'; and next thing I know, [Stewart] stood up and [Hilgefort]

screamed or yelled take your F-ing hat off; and about that time, [Hilgefort] reached up and [Stewart] took him to the ground." (Id. at 193). When asked if he would have felt threatened by Hilgefort, Thorne testified that he would have felt "uncomfortable." (Id. at 195). On cross-examination, Thorne testified that he heard Hilgefort ask Stewart to turn his hat around because he was seated at the same table as Stewart. (Id. at 198). He testified that he talked to Stewart about the incident a couple times, and he acknowledged that the situation could have been handled differently on both sides. (Id. at 201). Thorne testified that he saw Hilgefort raise his hand toward Stewart, but he did not know whether Hilgefort was "going for the hat or if he was going for [Stewart's] face." (Id. at 203). Thorne could not recall exactly how Stewart took Hilgefort to the ground, but he testified that he thought Stewart was trying to "contain" a possible situation. (Id. at 206-07).

{¶29} Jan Siepel testified that she used to work at the lodge with Hilgefort. (Id. at 211-12). Siepel testified that she had commonly witnessed Hilgefort drink alcohol while working. (Id. at 212). Siepel testified that the lodge enforced the attire rules strictly one day and loosely other days. (Id. at 213). Siepel testified that Hilgefort confronted a lodge patron who was eating a meal with his two little daughters about his wearing a sleeveless shirt, even though Hilgefort was not working. (Id. at 214). According to Siepel, Hilgefort told the man that he would

have to leave the lodge if he did not have a different shirt he could wear. (Id.).

Siepel testified that the man just asked for his bill and left the lodge. (Id). Siepel

also testified that Hilgefort wanted to fight with another patron one night in the

lodge parking lot, and that Hilgefort was on duty at the time. (Id. at 215). Siepel

further testified that she talked with Guillozet about the incident between Stewart

and Hilgefort, and Guillozet described the way Stewart took Hilgefort to the

ground as a police maneuver. (Id. at 217). Siepel also testified that the lodge had

a rule against using profanity. (Id. at 218). On cross-examination, Siepel testified

that she was not at the lodge the night of the accident. (Id.). She testified that she

did approach lodge patrons about their attire, but she never had anyone tell her no.

(Id. at 219-20). Siepel testified that one of her duties while working at the lodge

was to ask patrons to comply with the rules, and she testified that Hilgefort would

say the "F word" when he would ask patrons to follow the rules. (Id. at 221-22).

{¶30} Thereafter, the defense rested, and the plaintiff declined to offer

rebuttal testimony. (Id. at 225-26).

{¶31} With the relevant testimony set forth, we turn to Stewart's

arguments. Stewart first argues that the trial court erred by finding that he

committed an assault and battery against Hilgefort. We disagree. As an initial

matter, Stewart pled guilty to a misdemeanor criminal assault for his actions at the

lodge. (Oct. 22, 2009 Tr. at 151); (Plaintiff's Ex. 6-4). Additionally, the testimony

at trial demonstrated that Stewart was much larger in height and weight than Hilgefort, and the trial court, who was able to observe both men, found that Stewart appeared stronger than Hilgefort. (Oct. 22, 2009 Tr. at 30-31, 152); (Feb. 5, 2010 JE, Doc. No. 117). The testimony also revealed that, after Hilgefort informed Stewart that he would have to leave the lodge if he did not turn his hat around, Stewart stood up, directly facing Hilgefort within five to six inches of Hilgefort's face, and told Hilgefort if he wanted the hat reversed, he would have to turn it around for him. (Oct. 22, 2009 Tr. at 30, 118, 130). When Hilgefort refused to turn Stewart's hat around, Stewart grabbed Hilgefort's arm, twisted it, and threw Hilgefort to the ground, causing his right elbow to dislocate. (Id. at 30, 79, 90-92, 112, 146-47). Therefore, the record contains competent, credible evidence from which the trial court could have concluded that Stewart willfully threatened or attempted to harm or touch Hilgefort offensively and that Hilgefort was placed in fear of such harm or contact. *Retterer*, 111 Ohio App.3d at 854, abrogated on other grounds, quoting *Smith*, 83 Ohio App.3d at 406. The record also contains competent, credible evidence that Stewart acted intending to cause a harmful or offensive contact, and a harmful contact resulted; to wit: Hilgefort's dislocated elbow. *Love*, 37 Ohio St.3d at 99.

{¶32} Next Stewart argues that the trial court erred by failing to find he acted in self-defense. The trial court concluded that Stewart failed to establish that

he was *not* at fault for creating the situation and failed to prove he had reasonable grounds to believe he was in immediate danger of bodily harm. (Feb. 5, 2010 JE, Doc. No. 117). The trial court also specifically found that the testimony in support of Hilgefort's claim was more credible than the testimony offered in support of Stewart's claim. (Id.). We will not second guess the trial court's credibility determinations, nor will we reverse based on a "difference of opinion on credibility of witnesses and evidence * * *." *Wilson*, 2007-Ohio-2202, at ¶24, quoting *Seasons Coal Co.*, 10 Ohio St.3d at 81; *Knipp*, 2009-Ohio-4444, at ¶7. Aside from that, the record contains competent, credible evidence to demonstrate that Stewart was at fault in creating the situation by failing to turn his hat around after being told to do so several times by two different lodge employees. The only testimony in support of Stewart's claim of self-defense was his own testimony, which the trial court found not credible. When Stewart's friend, Thorne, was asked whether he would have felt threatened by Hilgefort's actions, he testified he would have merely felt "uncomfortable." (Oct. 22, 2009 Tr. at 195). Additionally, the testimony reveals that Stewart stood up to confront Hilgefort escalating the situation, and that Stewart was larger and stronger than Hilgefort. Finally, the trial court specifically found that the force used by Stewart was more than reasonably necessary and greatly disproportionate to any perceived or apparent danger. (Feb. 5, 2010 JE, Doc. No. 117). This finding is supported by competent, credible

evidence, and as such, self-defense was not available to Stewart. See *Hendrickson*, 2009-Ohio-4416, at ¶33, citing *Nichols*, 2002-Ohio-415. See, also, 2 OJI-CR 421.23. For all these reasons, we cannot find that the trial court erred by failing to find that Stewart acted in self-defense.

**{¶33}** Stewart further argues that the trial court erred by failing to find that Hilgefort assaulted him. The record contains competent, credible evidence to support the trial court's finding that Hilgefort did not threaten or attempt to harm Stewart. (Feb. 5, 2010 JE, Doc. No. 117). Hilgefort testified that he told Stewart to turn his hat around, but Stewart refused at which point Hilgefort told Stewart that "he'd have to get the hell out of here." (Oct. 22, 2009 Tr. at 29-30). When Stewart refused further, Hilgefort told Stewart "to get the F out of there," after which Stewart stood up and told Hilgefort that if he wanted his hat turned around to turn it around for him. (Id. at 30). Although there was testimony that Hilgefort pointed his finger at Stewart (or at Stewart's hat), several witnesses testified that Hilgefort did not make any attempts to strike or touch Stewart. (Id. at 31-32, 65, 92, 112, 130, 146, 193). Although Stewart testified that he felt threatened by Hilgefort, the trial court did not find Stewart's testimony credible. (Feb. 5, 2010 JE, Doc. No. 117). Since the record contains competent, credible evidence in support of the trial court's finding that Hilgefort did not assault Stewart, we will not reverse the trial court's decision.

{¶34} For all these reasons, Stewart's first, second, and fourth assignments of error are overruled.

### ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT ERRED WHEN IT AWARDED AN EXCESSIVE AMOUNT OF $20,000.00 FOR HILGEFORT'S PAIN AND SUFFERING AND TIME LOST FROM WORK BECAUSE HILGEFORT ONLY MISSED A FEW DAYS OF WORK AND HIS PAIN AND SUFFERING WAS MINIMAL.**

{¶35} In his third assignment of error, Stewart argues that the trial court awarded an excessive amount of compensatory damages to Hilgefort for his lost wages and pain and suffering. We disagree.

{¶36} The assessment of damages is within the province of the trier of fact, and a reviewing court is not at liberty to disturb the trier of fact's assessment absent an affirmative finding of passion and prejudice or a finding that the award is manifestly excessive. See *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 655, 635 N.E.2d 331, citing *Toledo, Columbus & Ohio River RR. Co. v. Miller* (1923), 108 Ohio St. 388, 402-03, 140 N.E. 617.

{¶37} The trial court found that Hilgefort lost $371.68 in wages, $300.00 in tips, and incurred $7,749.07 in reasonable and necessary medical expenses, which were paid by Ohio Workers' Compensation. (Feb. 5, 2010 JE, Doc. No. 117, ¶¶21-22). The trial court also found that Hilgefort: suffered "great pain" as a result his injury; underwent a reduction process to relocate his elbow for which he

was given pain medication; had completed physical therapy with pain and suffering; lost range of motion and strength in his elbow and had continued pain and suffering; and suffered permanent injury and limitations in his elbow, which will result in future pain and medical treatment. (Id. at ¶¶16-20). [1]

**{¶38}** The trial court's award of $20,000.00 for Hilgefort's lost wages and pain and suffering was not "manifestly excessive." Hilgefort testified that Stewart caused "level ten" pain to his arm at the time of his injury. (Oct. 22, 2009 Tr. at 33). Hilgefort testified that he visited Dr. Stover four or five times and did six to eight weeks of physical therapy. (Id. at 38). Hilgefort testified that he was in severe pain during the first three weeks of physical therapy, and the pain level dropped to a seven or eight after that. (Id. at 39). Hilgefort testified that his right elbow was injured and he was right-handed, and Hilgefort testified that he could not lift anything heavier than a gallon milk jug for several weeks, which affected his employment. (Id. at 40-41). Hilgefort testified that his arm felt pretty good now, though once or twice a week his elbow will be stiff for a couple of hours when he first wakes up, and once in a while his elbow will pop when he is lifting something above his head. (Id. at 42). Dr. Stover testified that Hilgefort may have some future discomfort and pain intermittently in his elbow. (Id. at 15).

---

[1] The trial court used Hilgefort's medical expenses and permanent injuries for purposes of determining Hilgefort's pain and suffering. As noted at oral argument, the compensatory damage award did not include the medical expenses or Hilgefort's permanent injuries. (See Oct. 22, 2009 Tr. at 13-15).

He also testified that it is possible that Hilgefort will experience arthritis, stiffness, and loss of motion in his elbow as a result of his injury. (Id. at 16). Based upon the record, we cannot conclude that the trial court's compensatory damages award was "manifestly excessive." *Moskovitz*, 60 Ohio St.3d at 655, citing *Miller*, 108 Ohio St. at 402-03.

{¶39} Stewart's third assignment of error is, therefore, overruled.

{¶40} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS, P.J. and WILLAMOWSKI, J., concur.**

**/jnc**