[Cite as *McDonald v. Cleveland State Univ.*, 2011-Ohio-7012.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

DEVORE MCDONALD, et al.

    Plaintiffs

    v.

CLEVELAND STATE UNIVERSITY

    Defendant

Case No. 2009-02987

Judge Clark B. Weaver Sr.

DECISION

{¶1} Plaintiffs brought this action alleging assault, battery, negligence, and negligent hiring, training, retention, and supervision. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶2} This case arises out of allegations by plaintiffs, Devore McDonald and her daughter Janita McDonald, that defendant's police officers used excessive force upon them during a March 13, 2008 incident at the Wolstein Center on defendant's campus.

{¶3} The Wolstein Center hosted a comedy show that evening and Devore McDonald testified that she purchased four advance tickets to the show for Janita, herself, her son Jerome, and Jerome's girlfriend Kendra. Although the show began at 8:00 p.m., Devore and Janita both testified that they arrived at the Wolstein Center sometime after 9:00 p.m., at which time they met Jerome and Kendra in the lobby. Devore related that upon entering the facility, she and Janita proceeded directly to their seats, while Jerome and Kendra remained in the concourse. Inasmuch as their physical

descriptions are at issue in this case, the court notes that Devore stated that she wore a fur coat, while Janita testified that she wore a gray dress.

{¶4} According to Devore and Janita, when they entered the seating area, an usher whom they described as a young African American woman pointed them toward their seats, but after climbing the stairs they determined that their seats were occupied by a party of three men and a woman. Devore testified that one member of this party, a heavy-set man, stood up and argued with her, insisting that his party was in the correct seats. Janita testified that she then went back down the stairs and requested assistance from the same usher she saw on her way in. According to Devore and Janita, the usher came up the stairs and asked to see the man's tickets, but he refused to comply. Devore testified that she then asked for the usher's flashlight and used it to illuminate her tickets, but that the man argued further and ultimately shoved her, whereupon she asked the usher to summon the police.

{¶5} Devore stated that four of defendant's police officers soon ascended the stairs and that the incident transpired as follows: an officer asked her to go downstairs; she declined to do so and tried to explain her side of the story; the officer again asked her to go downstairs; she complied with this order and walked down three or four stairs but stopped and turned around to see if Janita was following her; officer Regina Baker placed her in a "choke hold" and escorted her down the main stairs to the landing; at the landing, Baker pushed her face into a concrete wall; Baker then escorted her from the landing down the remaining stairs to the concourse; Baker passed her to officer Murawski, who then brought her to the ground. Devore testified that Murawski helped her to her feet soon afterward and led her through the curtain that separated the seating area from the concourse, at which point she saw Janita laying face-first on the ground, with two officers above her.

{¶6} Janita recalled the incident as follows: four officers ascended the stairs; a male officer told Devore and Janita to come down the stairs; Devore tried to explain her side of the story and insisted that both parties should come down the stairs; the male officer again told Devore and Janita to come down the stairs; Devore and Janita complied and began descending the stairs, but officer Baker placed Devore in a choke

hold and escorted her down to the landing; at the landing, Baker pushed Devore into a wall and placed Devore's arms behind her back; Janita asked Baker why she was treating Devore this way, but did not touch Baker; Baker brought Devore down the remaining stairs toward the concourse, where another officer took control of Devore; Baker then grabbed Janita by her dress, a male officer also grabbed Janita, and the male officer then kicked her feet out from under her and took her to the ground, causing her face to hit the ground, and causing injury to her wrist; the male officer placed her in handcuffs, escorted her outdoors, and placed her in a patrol car.

{¶7} According to Janita, the arresting officer informed her that she was being cited with disorderly conduct for "making officer Baker mad." Devore testified that after Janita was released at the scene, officers told Devore that she could re-enter the arena, but that Janita could not. Devore and Janita both stated that they decided to leave the Wolstein Center and drive to Southpoint Hospital so that Janita could be examined for injuries. Thirteen days later, on March 26, 2006, Devore visited defendant's police department and filed a report concerning the incident. (Plaintiffs' Exhibit 1.)

{¶8} Sandra Belaj testified by deposition that she has worked as a part-time usher at the Wolstein Center since 2005, but that her employer is Sports Management Group (SMG), a company that contracts with defendant to manage events at the Wolstein Center. Belaj testified that she ushered on the evening in question and was stationed in the upper bowl of the seating area. Whereas Devore and Janita testified that they only saw a young African American usher, Belaj is a middle-aged Caucasian.

{¶9} Belaj recalled the incident as follows: an African American woman wearing a fur coat and holding a drink, who was accompanied by a younger African American woman wearing gray clothing, tapped her on the shoulder and asked to be shown to her seat; although ushers in the upper bowl generally do not show patrons to their seats, she agreed to do so because the older woman was insistent; she ascended the stairs with the women and saw that the seats were occupied by one or more men; a man in one of the seats acknowledged that he was in the wrong seat and agreed to move; before the man could gather his belongings and move, the older woman became agitated, grabbed Belaj's flashlight, shone it in the man's face, exclaimed "you're in my

seat, motherfucker," and poked the man; the man swatted the woman's hand away, and an argument ensued; Belaj told Jala Khateeb, a female usher who stood nearby, to summon security; Belaj descended the stairs to the landing; two of defendant's police officers appeared, with one remaining on the landing while the other ascended the stairs; the male officer who ascended the stairs escorted the older woman by the arm down the stairs, while the younger woman screamed and yelled at the officers; one or both of the women became combative with the officers, and Belaj was inadvertently struck on her arm and ankle when they crossed the landing; at the bottom of the stairs, an officer kneed one of the women in the back of the legs and took her to the ground, while the other was restrained standing upright, without handcuffs; and, officers escorted the women away.

{¶10} Belaj stated that she was upset after the incident and went to regain her composure in the restroom, but a supervisor saw her and told her to go to the nurse's station to be examined for injuries. According to Belaj, she had bruising on her arm and ankle and remained in the nurse's station icing her wounds for the remainder of the show. Belaj stated that her supervisor had her complete an incident report that evening to document her injuries, and that one of defendant's police officers approached her at a concert about one week later and asked her to fill out a more thorough report.

{¶11} Regina Baker testified that she has served as a full-time police officer for defendant for eight years, and that she was previously a part-time officer for the village of North Randall, Ohio. Baker stated that she was stationed in the concourse of the Wolstein Center on the night in question and received a radio call for assistance with a "fight in progress." According to Baker, when she responded to the scene, she saw officers Dietz and Peroska ahead of her going up the stairs toward an argument.

{¶12} Baker recalled the incident as follows: an approximately fifty-year old African American woman was arguing with "four guys" who were seated, and all involved were cursing and threatening one another; Dietz and Peroska spoke with the seated party, while she spoke with the woman; given the circumstances of the loud and dimly-lit environment, the woman's refusal to calm down, other spectators growing upset and complaining about the disturbance, and the chance that someone might be

pushed or otherwise fall in the steep aisle, Baker asked the woman to come down the stairs five or six times; the woman refused to comply, so Baker escorted her by the arm down the stairs to the landing; the woman said she did not want to leave her son and then pushed Baker in an attempt to go back up the stairs; at either the landing or the bottom of the stairs near the concourse, another woman grabbed Baker's shoulder's from behind and screamed "that's my mother, she doesn't got to go fucking nowhere"; officer Nolasco told the younger woman to get off of Baker, then intervened and brought the woman to the ground and handcuffed her; Sergeant Hunt took the older woman from Baker; the men who had been in the seats were escorted away by Dietz and Peroska; and, Baker returned to her post and later completed a report at Hunt's request. (Plaintiffs' Exhibit 3.)

{¶13} With respect to the force that she used, Baker testified that it was necessary to escort the older woman away inasmuch as the quarrel between the parties and the woman's refusal to cooperate with officers posed a threat to those involved and to other patrons. Baker further stated that it was necessary for her to grab the younger woman and for Nolasco to forcibly restrain her inasmuch as the woman was attacking Baker from behind in a dark, chaotic environment, and Baker was concerned for the security of the firearm and Taser gun holstered to her belt.

{¶14} Robin Dietz testified that she has worked for twelve or thirteen years as a part-time police officer for defendant, and full-time as a detective for the Greater Cleveland Regional Transit Authority for 14 years. Dietz testified that on the night in question, she was stationed at one of the gates in the Wolstein Center when she received a radio call to respond to Gate A. According to Dietz, she and officer Peroska were the first officers on the scene, and as they ascended the stairs, she saw an older African American woman arguing almost face to face with a man who was over six feet tall and appeared to weigh more than 300 pounds. Dietz described the incident as follows: when she and Peroska attempted to calm the parties down, the man complied, but the woman became belligerent with the officers, flailed her arms, and escalated the altercation; officer Baker arrived and escorted the woman by the arm down to the landing; Dietz and Peroska escorted the man outside, examined his tickets, and

determined that his party was in the correct seats; Dietz went to the guest services desk with the man to obtain new seats for safety reasons inasmuch as she did not want the woman to be able to return to the scene and renew the quarrel. Dietz stated that she later completed a report at Sergeant Flaherty's request. (Defendant's Exhibit B.)

{¶15} Vincent Nolasco, who has worked as a police officer for defendant since 2005, testified that he was in a patrol car on the night in question. Nolasco stated he received a dispatch over the radio concerning a fight in progress at the Wolstein Center, being one of about 12 such reports that evening, and that he immediately drove to the proper gate and entered the facility. Nolasco testified that as he passed through the concourse and entered the seating area, he saw officers Dietz, Baker, and Peroska on the stairs above the landing amidst what appeared to be a "melee." Nolasco recalled the subsequent events as follows: Peroska was engaged in an altercation with a man on the stairs, while Baker attempted to escort a woman down the stairs; the woman wrestled with Baker; upon reaching the landing, Baker placed the woman against a wall, but the woman tried to get free; another woman interfered with Baker, so he intervened, brought that woman to the ground by grabbing her left arm and manipulating a pressure point, and then handcuffed her; officer Mady then assisted him in escorting the woman to his patrol car; he cited the woman for disorderly conduct for fighting with Baker and himself; and, he released the woman at the scene because it was a busy night and taking her off campus for booking would have taken too long. Nolasco testified that he wrote a report the following day, March 14, 2008, and another report at the request of Lieutenant King. (Plaintiffs' Exhibits 5, 6.)

{¶16} Concerning the force that he used during the incident, Nolasco stated that he believed it was necessary given the dark and chaotic setting, Baker was alone while trying to restrain one woman while the quarrel in the seats appeared to be ongoing, the other woman pushed and wrestled Baker, and Baker's weapon was vulnerable to being removed from her belt. Nolasco stated that he did not fall to the ground during the incident, that he did not put his knee in the back of the woman whom he arrested, and he denied telling the woman that she had been arrested for "making officer Baker mad."

{¶17} Thomas Murawski testified that he worked on and off as a part-time police officer for defendant from about 1990 to 2010, typically for special events, and that he has been employed full-time for many years as a detective with the Greater Cleveland Regional Transit Authority. Murawski stated that on the night in question, he responded to a radio call, passed through the curtain separating the concourse from the seating area, and saw several people on the landing of the stairs surrounding officer Baker, who was trying to restrain or escort a woman. According to Murawski, a younger woman was reaching around Baker, trying to pull her away from the older woman; Baker then turned around toward the younger woman; Murawski intervened and restrained the older woman using a firm grip and his body to block her; Murawski continued holding the older woman until the younger woman was taken to the ground and handcuffed by officer Nolasco; and, Murawski then escorted the older woman outdoors, where a full-time officer took charge of her. Murawski stated that he believed his use of force was appropriate given that Baker was under attack from the younger woman, the older woman was attempting to get free, and Baker's firearm was in a vulnerable position. Murawski testified that he prepared an incident report on March 26, 2008. (Plaintiffs' Exhibit 8.)

{¶18} Rodney Allison, who has worked as a police officer for defendant for six years, testified that he was assigned to patrol the perimeter of the Wolstein Center in a car on the night in question. Allison stated that he received a radio call concerning a fight, one of many that evening, and that he drove to Gate A, where he witnessed officers escorting five to eight people out of the building, including two African American women and three or four men. Allison stated that he approached the older of the two women, who was agitated, yelling at officers, and "somewhat out of control." According to Allison, he advised the woman that she could be cited for disorderly conduct, and she ultimately calmed down. Allison testified that he then asked for her identification, but she responded that she did not have identification on her and orally provided a Social Security number and date of birth; Allison radioed this information to a dispatcher who checked it in the LEEDS database and determined that the information was false; and, Allison asked again for this information but the woman gave him more false information

and ultimately said that she did not know her Social Security number. Allison related that he later prepared a statement concerning the incident at the request of a superior officer. (Defendant's Exhibit A.)

{¶19} Joseph Hunt has served as a sergeant in defendant's police department for four years, and has been employed with the department for a total of nine years. Hunt testified that he served as the "event commander" for the show at the Wolstein Center, in which capacity he assigned officers to posts throughout the arena and supervised them. Hunt stated that by the time he responded to the incident, all persons involved had been brought outdoors, where he saw Devore arguing with approximately two men. Hunt stated that he intervened, and that because the men were cooperative but Devore remained belligerent, he allowed the men to return to the show and then asked Devore for identification. According to Hunt, Devore had no identification and provided a Social Security number and date of birth that proved to be inaccurate when checked in the LEEDS database; Hunt stated that when he asked Devore for this data once more, she told him that she did not need to provide such information. Hunt testified that after speaking with officers, he determined that Janita should be cited for disorderly conduct for fighting with officers, but she was released at the scene because his officers were too busy to have her booked, given that the event that evening "was a problem show" with numerous fights and other incidents. Hunt related that he instructed officer Nolasco to visit the Cleveland city prosecutor's office the following day to determine if any additional charges against Janita were appropriate.

{¶20} David Buckingham, defendant's Police Commander and Assistant Director of Campus Safety, testified that when Devore visited the police department and filed a complaint on March 26, 2008, he assigned Lieutenant King to investigate the matter. Buckingham stated that several officers involved in the incident subsequently wrote statements at King's request. According to Buckingham, however, the investigation was never completed because when the police department left telephone messages to follow up with Devore, she never returned the calls. Buckingham testified that he is responsible for reviewing the police department's policies and procedures, that the use of force policy in effect at the time had been in place since 2002, and that all officers

were provided with the policy and any officers new to the force since 2002 were specifically trained in the same.

{¶21} Plaintiffs' expert, Thomas J. Lekan, is a security consultant who previously served as Chief Security Officer for Key Bank, as well as Director of Security and Safety for Nestlé/Stouffer Hotels, where his responsibilities included managing the security for concerts and sporting events. Lekan testified that, in general, it is an industry standard among entities that provide security for large public events, such as the show in question, to employ a tiered security plan that utilizes ushers, private security personnel, and uniformed peace officers. According to Lekan, these tiered plans rely on private security personnel to resolve disputes such as that in which plaintiffs were involved, and rely on peace officers only to effect an arrest when necessary.

{¶22} Lekan testified that the standard of care when force is used by peace officers is that they should use only such force as reasonably necessary to effect an arrest, but he acknowledged that officers may also forcibly escort an individual to another location if that individual refuses an officer's request to move. Lekan also admitted that it was appropriate for the officers in this case to separate the parties who were arguing in the seats in order to prevent the dispute from escalating and to avoid disrupting the show. However, Lekan opined that Baker's grabbing or using a choke hold on Devore would have exceeded the force reasonably necessary to escort her. Lekan further opined that Nolasco used excessive, unreasonable force against Janita because she posed little threat to anyone and thus did not need to be taken to the ground.

{¶23} Defendant offered expert testimony from its Executive Director of Campus Safety, Bernard Buckner. Buckner was previously employed as the Chief of Police for the Cleveland Metropolitan Housing Authority, the Manager of Protective Services for the Cuyahoga County Commissioners, and the Administrative Commander of Police for the Greater Cleveland Regional Transit Authority. Buckner testified that the event at the Wolstein Center was managed by SMG, and that under the management agreement between SMG and defendant, SMG had the discretion to decide whether private security personnel would be utilized, and defendant exercised its discretion in

developing a plan for deploying its officers in and around the Wolstein Center during such events based on the information it received from SMG relative to the event. Buckner stated that industry standards do not require that private security personnel be utilized at events such as the one in question, and he opined that the security arrangements in place for the event were appropriate.

{¶24} Buckner opined that the use of force, including a choke hold, to escort Devore away from the quarrel in the seats, as well as a forcible "balance displacement" of Janita to effect her arrest were appropriate under the circumstances and were in accordance with defendant's use of force policy. (Plaintiffs' Exhibit 9.) With respect to the training that defendant's officers received in the use of force, Buckner stated that it was informally trained at times during officers' roll call, and was taught to some degree at an annual training session for the officers.

{¶25} Turning to plaintiffs' claims for relief, the court shall first consider the claims of assault and battery. "[T]he tort of assault is defined as the willful threat or attempt to harm or touch another offensively, which threat or attempt reasonably places the other in fear of such contact." *Smith v. John Deere Co.* (1993), 83 Ohio App.3d 398, 406. "A person is subject to liability for battery when he acts intending to cause a harmful or offensive contact, and when a harmful contact results." *Love v. Port Clinton* (1988), 37 Ohio St.3d 98, 99.

{¶26} "Officers are privileged to commit battery when making a lawful arrest, but the privilege is negated by the use of excessive force." *Alley v. Bettencourt* (1999), 134 Ohio App.3d 303, 313. Whether or not making an arrest, peace officers are also privileged to use force against another to terminate an affray if "(a) the other is or the actor reasonably believes him to be participating or about to participate in the affray, and (b) the confinement or force is not intended or likely to cause death or serious bodily harm, and (c) the actor reasonably believes that the force or confinement is necessary to prevent the other from participating in the affray or other equally serious breach of the peace." Restatement of the Law 2d, Torts (1965) 252, Section 141.

{¶27} "The use of force against another for the purpose of effecting the arrest or recapture of the other, or of maintaining the actor's custody of him, is not privileged if

the means employed are in excess of those which the actor reasonably believes to be necessary." Id. at 236, Section 132; see also *Vanwinkle v. Dayton* (Apr. 3, 1989), Montgomery App. No. 11115 ("[T]he use of excessive force by one privileged to use force on another constitutes assault and battery."). "[I]f the actor is making or attempting to make an arrest for a criminal offense he is acting for the protection of the public interest and is permitted even a greater latitude of discretion than when he acts in self-defense, and he is not liable unless the means which he uses are clearly excessive." Restatement of the Law 2d, Torts (1965) 236, Section 132, comment *a*.

{¶28} Therefore, "only in cases where excessive force is used, that is, force going clearly beyond that which is reasonably necessary to make an arrest, can such force be claimed an assault and battery by the person arrested." *Schweder v. Baratko* (1957), 103 Ohio App. 399, 403. "The reasonableness of force is measured by the facts and circumstances of each particular case, including the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Alley*, supra, citing *Graham v. Connor* (1989), 490 U.S. 386, 396.

{¶29} The evidence demonstrates that defendant's officers used force against both Devore and Janita McDonald. With respect to Devore, the court finds that officer Baker applied force to Devore's arm and neck to forcibly escort her down the stairs and forcibly restrained her against a wall, whereupon officer Murawski intervened, brought her to the ground with minimal force, restrained her, and escorted her outdoors. Upon review, the court finds that the use of force upon Devore was reasonable and not excessive inasmuch as she resisted orders from the officers and was persistently belligerent with them; the officers reasonably believed it necessary to forcibly prevent her further participation in the quarrel that had developed in the seating area; and, the force used was not intended or likely to cause serious bodily harm or death.

{¶30} With respect to the force used upon Janita, the court finds that immediately after Baker conveyed Devore to Murawski's custody, Baker grabbed hold of Janita by her clothing, and officer Nolasco kicked Janita's legs out from under her, brought her to the ground, handcuffed her, and escorted her from the premises to his patrol car.

{¶31} Upon review of the evidence, and weighing the credibility of each witness, the court finds that the force used by Nolasco to bring Janita to the ground was unreasonable and clearly excessive. Although Baker testified that Janita pulled at her and jumped on her back, and Nolasco stated that he saw Janita push and wrestle Baker, the court finds Janita to be more credible in testifying that she did not touch Baker or any other officer, but rather only exchanged words with them. Similarly, although Baker testified that Nolasco fell to the ground with Janita and wrestled with her for a couple of minutes, Janita's testimony that she did not wrestle with Nolasco was more credible, and indeed Nolasco stated that he did not fall to the ground or wrestle with Janita. While Balaj testified by way of deposition that both of the women she saw may have been combative with officers, not a single witness recalled seeing Balaj in the area, and no witness corroborated her testimony that one of the women was drinking. Balaj testified that a male officer escorted one of the women down the stairs and described other details that do not agree with the totality of the evidence, and the court finds her testimony lacking in credibility. Although Janita was admittedly upset with Baker and perhaps other officers, she testified that she was crying at the time and was not combative, and Murawski stated that he recalled seeing Janita crying; further, concerning her physical state at the time, Janita stated that she had given birth to a child less than a month before the incident.

{¶32} Regarding the manner of force used by Nolasco to bring Janita to the ground, the court finds that Nolasco kicked Janita's legs out from under her, causing her to fall to the ground face-first and injure her wrist, and Nolasco's kick was more in the nature of striking a blow than executing a tactical balance displacement. Although Nolasco stated that he had arrived only a moment earlier, in response to a dispatch of a "fight" in progress, and that he believed Baker and other officers were involved in a "melee" wherein Janita was attacking Baker, the evidence demonstrates that Nolasco overestimated the severity of both the circumstances and Janita's conduct, and that Janita did not pose an immediate threat to the safety of anyone. Based on the court's finding that Janita did not touch Baker and did not pose an immediate safety threat, the

degree of force used by Nolasco clearly exceeded what was reasonable under the circumstances.

{¶33} Accordingly, the court finds that Janita demonstrated by a preponderance of the evidence that officer Nolasco used excessive force amounting to assault and battery. The court further finds that although Nolasco's actions were excessive and improper, they were nonetheless "'calculated to facilitate or promote the business'" for which he was employed, thus rendering defendant liable under the doctrine of respondeat superior. *DiPietro v. Lighthouse Ministries*, 159 Ohio App.3d 766, 2005-Ohio-639, ¶15, quoting *Byrd v. Faber* (1991), 57 Ohio St.3d 56, 58.

{¶34} In addition to the intentional torts of assault and battery, plaintiffs have also asserted claims for negligence. However, insofar as such claims are predicated upon intentional actions by defendant's police officers, their essential nature sounds in assault and battery. See *Love*, supra; *Williams v. Pressman* (1953), 69 Ohio L. Abs. 470 ("An assault and battery is not negligence, for such action is intentional, while negligence connotes an unintentional act."); Restatement of the Law 2d, Torts (1965) 10, Section 282, comment *d*. Furthermore, even if the court were to assume that plaintiffs stated a valid claim of negligence based on defendant's alleged failure to "provide a safe and secure environment" for invitees of the Wolstein Center, the court concludes that plaintiffs failed to establish any such claim; weighing the testimony of the experts, the court found Buckner to be more persuasive than Lekan in testifying that an adequate security management plan was in place. Although Lekan also testified as to the adequacy of defendant's use of force policy, any claim challenging the same is barred by the doctrine of discretionary immunity. See *Reynolds v. State* (1984), 14 Ohio St.3d 68, 70 ("the state cannot be sued for * * * the exercise of an executive or planning function involving the making of a basic policy decision which is characterized by the exercise of a high degree of official judgment or discretion."). Lastly, regarding plaintiffs' claim for negligent hiring, retention, training, and supervision, the elements that must be established in order to sustain such a claim are: "(1) the existence of an employment relationship; (2) the employee's incompetence; (3) the employer's actual or constructive knowledge of such incompetence; (4) the employer's

act or omission causing plaintiff's injuries; and (5) the employer's negligence in hiring or retaining the employee as the proximate cause of plaintiff's injuries." *Peterson v. Buckeye Steel Casings* (1999), 133 Ohio App.3d 715, 729. In short, "if an employer, without exercising reasonable care, employs an incompetent person in a job which brings him into contact with others, then the employer is subject to liability for any harm the employee's incompetency causes." *Abrams v. Worthington*, 169 Ohio App.3d 94, 2006-Ohio-5516, ¶14. "[A]n underlying requirement in actions for negligent supervision and negligent training is that the employee is individually liable for a tort or guilty of a claimed wrong against a third person * * *." *Strock v. Pressnell* (1988), 38 Ohio St.3d 207, 217.

{¶35} Plaintiffs allege that incompetence on the part of defendant's officers manifested itself in the excessive use of force upon plaintiffs. However, inasmuch as the court has found underlying liability only on the part of officer Nolasco, plaintiffs' claim is untenable with regard to the conduct of any other of defendant's employees. Upon review, the court finds that there is no evidence that Nolasco had a propensity or past history of using excessive force. Further, Nolasco testified that he received comprehensive annual training that included instruction in the use of force, and that he also received such instruction during both "roll-call" and "in-service" sessions. And, according to Buckingham, Nolasco received use of force training upon his hiring. Upon review, the court finds that plaintiffs failed to prove their claim of negligent hiring, retention, training, and supervision by a preponderance of the evidence.

{¶36} For the foregoing reasons, judgment shall be rendered in favor of plaintiff, Janita McDonald, on her claims of assault and battery, and judgment shall be rendered in favor of defendant on plaintiffs' remaining claims.



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

DEVORE MCDONALD, et al.

    Plaintiffs

    v.

CLEVELAND STATE UNIVERSITY

    Defendant

Case No. 2009-02987

Judge Clark B. Weaver Sr.

<u>JUDGMENT ENTRY</u>

{¶37} This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of plaintiff, Janita McDonald. The case will be set for trial on the issue of damages.

_____
CLARK B. WEAVER SR.
Judge

cc:

Emily M. Simmons
Eric A. Walker
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Jeffrey D. Lojewski
Rockefeller Bldg., Suite 1425
614 West Superior Avenue
Cleveland, Ohio 44113-9850

Filed December 9, 2011
To S.C. reporter March 5, 2012