**[Cite as *Poole v. Ohio State Univ. Wexner Med. Ctr.*, 2018-Ohio-2277.]**

| | |
|---|---|
| TABITHA POOLE, et al. | Case No. 2016-00733JD |
| Plaintiffs | Magistrate Anderson M. Renick |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| THE OHIO STATE UNIVERSITY WEXNER MEDICAL CENTER | |
| Defendant | |

{¶1} Plaintiffs brought this action alleging assault and battery. The case proceeded to trial on the issues of liability and damages.

{¶2} This case arises from an incident at defendant The Ohio State University Wexner Medical Center (OSUWMC) which occurred on November 22, 2015. Plaintiffs Tabitha Poole and her daughter, Talaria Ferguson, allege that defendant's security staff used excessive force upon them while Poole was a patient in the OSUWMC emergency room (ER).[1]

{¶3} Plaintiff testified that since sometime in 2008, she has experienced symptoms from epilepsy and neuropathy that developed as a result of a traumatic brain injury. Plaintiff related that she has epileptic seizures every day which vary in severity from "partial" to "grand mal." On the day in question, plaintiff was taken to OSUWMC after she noticed that a surgical dressing ("steri-strips") which was covering an abdominal incision from a recent surgical procedure had become loose, resulting in bloody drainage from the incision. Plaintiff testified that she had a seizure while she was being treated which caused her to lose consciousness and that, when she regained awareness, a security guard was talking to her daughter and a nurse. Plaintiff recalled a doctor and a nurse attending to her before she was placed in a wheelchair to be escorted from the examination room. Plaintiff testified that she also recalled she

---

[1]"Plaintiff" shall refer to plaintiff Tabitha Poole.

became upset when a woman placed her finger "in [plaintiff's] face." Plaintiff explained that, due to her neuropathy, she was unable to comply with directions to lift her feet while she was in the wheelchair. According to plaintiff, a security guard who was attempting to push the wheelchair out of the ER lifted the back of the chair and "flipped" her out of the chair and onto the floor. Plaintiff stated that while she was restrained on the floor she was placed in handcuffs and suffered another seizure. Plaintiff testified that when her daughter tried to intervene to protect her, a security guard threw her daughter to the floor by pulling her hair. A police officer helped plaintiff get up off the floor and he took her to a room where she remained until she was released.

{¶4} Plaintiff testified that as a result of being assaulted by defendant's employees, she suffered injuries to her head, shoulders, arms, back, and legs. Plaintiff identified photographs that depict what appears to be scrapes and bruising on her face and head. (Plaintiff's Exhibits 1-9, 11-13.) Plaintiff testified that she and her daughter took the photographs within a couple days of the incident. Plaintiff subsequently testified that the photographs depicting injuries were taken with a cell phone camera on December 3, 2015, the date that was reflected on the digital images. On November 25, 2015, three days after the incident, plaintiff and her daughter were examined at the Diley Ridge Medical Center. (Plaintiffs' Exhibits 2 and 3.) Plaintiff testified that she continues to experience pain in her left shoulder, back, and head. According to plaintiff, the assault by defendant's employees has caused her to become anxious whenever she encounters security guards.

{¶5} During cross examination, plaintiff testified that she did not recall much of her interaction with defendant's medical staff. Plaintiff denied hitting a nurse and she explained that she apologized to Nurse Pierce after being informed by security guards that the nurse was upset about the incident. Plaintiff also denied striking any security guard or emergency medical technician (EMT). Plaintiff testified that she was surprised that her OSUWMC medical records did not mention any injuries from the alleged

assault, such as the scrapes or contusions that are depicted in the photos which were identified at trial.

{¶6} Plaintiff Talaria Ferguson described her mother's medical condition prior to the day of the incident and she explained that during a grand mal seizure, plaintiff would involuntarily swing her arms and legs. According to Ferguson, plaintiff experienced grand mal seizures "every day" and less severe seizures occurred several times each day. Ferguson testified that plaintiff had a grand mal seizure while she was being treated by Nurse Pierce and that Nurse Pierce left the examining room and then returned with a security guard. Ferguson informed the security guard that plaintiff had had a seizure and that any physical contact plaintiff had with either Nurse Pierce or Ferguson was unintentional. Ferguson testified that as the security guard continued to ask questions, other medical staff arrived in the room and then the situation began "getting rowdy."

{¶7} According to Ferguson, another nurse attempted to get plaintiff to lift her feet onto wheelchair foot supports, but plaintiff responded that that was "how she likes to sit" and she requested to use her own "walker-roller." Ferguson stated that when a female staff member had her finger close to plaintiff's face, plaintiff told her to move her finger and then she stood up from sitting in the wheel chair. Ferguson related that she believed that plaintiff was having a seizure and that she observed a security guard forcibly tilt plaintiff's wheelchair forward to "flip" plaintiff onto the floor after the guard became agitated that plaintiff did not lift her feet. Ferguson testified that she attempted to help her mother, but a security guard pulled her hair, causing her to fall to the floor where she remained for approximately five minutes before she was dragged down a hallway and placed in handcuffs. Ferguson stated that she suffered a concussion and injuries to her right shoulder and lip. On November 25, 2015, Ferguson was treated at Diley Ridge Medical Center for her injuries and related migraine headaches.

{¶8} During cross examination, Ferguson maintained that she did not resist or fight back when she was assaulted. Ferguson testified that other security and medical staff were present when she was restrained and dragged down the hall of the ER.

{¶9} Nurse Annmarie Pierce testified that she recalled the incident and that she had multiple contacts with plaintiff on that day. Pierce performed a "wound check" of plaintiff's incision and replaced the steri-strips that covered the incision. Pierce related that after plaintiff received her discharge instructions, she gave plaintiff crackers because she had requested food. Pierce was taking plaintiff's vital signs while plaintiff was lying still on a gurney when she suddenly struck Pierce in the abdomen with her left arm. Pierce stated that, at that time, she was not engaged in conversation and that plaintiff showed no other signs of agitation. Pierce related that she was "off guard" when she was hit hard, causing some bruising.

{¶10} Pierce testified that she had a great deal of experience treating patients who had seizures and that plaintiff was awake and did not exhibit behavior that was typical of seizure patients. Pierce stated that plaintiff's daughter told her that plaintiff was having a seizure when Pierce exclaimed that plaintiff had hit her. According to Pierce, plaintiff began yelling at her, and exclaiming that she was having a seizure. Pierce asked another nurse to escort plaintiff out of the ER because plaintiff seemed upset with her. Pierce testified that she did not observe the subsequent altercation between plaintiffs and defendant's security staff.

{¶11} Steven Wollenberg, the Associate Director of Security for OSUWMC, testified regarding defendant's security training and its use of force policy. (Defendant's Exhibit B.) Wollenberg testified that, generally, defendant's use of force policy requires staff members to use the minimum amount of force necessary to control a situation and to use all means necessary to de-escalate a conflict, especially with regard to patients. Wollenberg was familiar with the incident at issue through witness reports, but he was not present during the incident. Wollenberg explained that security cameras were

present in the ER, but that the incident was not recorded because cameras were not located in treatment areas.

{¶12} Wollenberg testified that OSUWMC security officers receive extensive training from certified instructors, including on the job training and annual refresher training. Wollenberg stated that no disciplinary action was taken against any of the security staff involved in the incident.

{¶13} Joan Reisdorf, RN, testified that she had been licensed as a nurse for 40 years, with 30 years of experience working in an ER. Reisdorf was working as the charge nurse on the day of the incident and she testified that Pierce told her that she had been punched by plaintiff. Reisdorf learned that plaintiff had been discharged and she called hospital security to talk to plaintiff about striking Nurse Pierce. Reisdorf testified that plaintiff was being transported in a wheelchair when she became verbally abusive towards defendant's staff and that she subsequently tried to strike Nurse Danielle Smolek. Reisdorf stated that plaintiff's daughter jumped on one of the security officers and that plaintiff refused to leave the ER. Reisdorf called OSUWMC police when she observed security officers being assaulted by plaintiffs. Reisdorf testified that she later saw Devon Shackle, an EMT who was involved in trying to restrain plaintiff, was bleeding from a cut on his face. According to Reisdorf, plaintiff's daughter was "assisted" to the floor by security officers without using excessive force.

{¶14} Danielle Smolek, RN, testified that during plaintiff's discharge she attempted to push plaintiff's wheelchair out of the ER when plaintiff "slammed" her feet down so that the wheelchair would not move and she swung her arm toward Smolek, but did not strike her. According to Smolek, plaintiff stated that she was not going anywhere until she received a sandwich. Soon thereafter, Smolek noticed that OSUWMC security personnel had arrived. Smolek testified that she moved in front of the wheelchair and plaintiff began to yell and then stood up from a sitting position and lunged at her. Smolek observed plaintiff's daughter jump on the back of one of the

security guards. After plaintiff and her daughter were restrained, Smolek noticed that Shackle had a cut on his face.

{¶15} Heidi Evans, a licensed independent social worker, testified that she had worked at the OSUWMC ER for approximately five years, during which time she responded to trauma incidents, provided emotional support to patients and their families, and provided various other social services. On the day in question, she was called to help arrange transportation services to get plaintiff home from the ER. Evans heard plaintiff yelling and she observed her sitting in a wheelchair with her feet on the floor while refusing the directions of hospital staff to raise her feet. Evans testified that security staff attempted to move the wheelchair when plaintiff stood up and attacked the security officers.

{¶16} Devon Shackle, an EMT at OSUWMC, testified that he first became aware of the incident when he heard plaintiffs cursing and yelling, which became louder after security officers arrived. Shackle testified that the security officers were trying to get plaintiffs to leave the ER, but plaintiffs refused. According to Shackle, the officers attempted to de-escalate the situation and move plaintiff out of the ER, but plaintiff purposefully and forcibly stopped the wheelchair from moving by putting her feet down on the floor. Shackle testified that he and Nurse Smolek were in front of the wheelchair when plaintiff jumped out of the chair, grabbed him by the neck, and scratched his face. After the altercation, a doctor examined injuries to Shackle's face and arm. Shackle noticed that he was bleeding from his facial injury and that his glasses were broken. He stated that the security officers' efforts to restrain plaintiff were professional and did not involve enough force to cause injury to plaintiff. Shackle testified that he observed plaintiff with the security officers after she had been restrained and that she did not have any visible injuries at that time.

{¶17} Sergeant Jonathan Grant testified that he was working as an OSUWMC field training officer when he was dispatched to an "unruly call." Grant stated that he

arrived after plaintiff had struck Nurse Pierce and he interviewed plaintiff about the incident. Plaintiff informed Grant that she had had a seizure and that she did not recall the incident. Grant testified that plaintiff asked for a sandwich and then began screaming. According to Grant, he tried repeatedly to de-escalate the situation and pleaded with plaintiff to calm down and leave the ER. Grant observed plaintiff's daughter lunge at OSUWMC staff at which time he and other security staff placed her on the floor and restrained her with handcuffs. Grant estimated that it took approximately 20 to 30 seconds to secure the handcuffs and that plaintiff's daughter was on the ground for less than one minute before she was helped up and escorted to a room in the ER. Grant testified that Ferguson continued screaming, began kicking items in the room, and at first refused to sit down. Grant denied both grabbing Ferguson's hair and dragging her on the floor. Grant testified that plaintiff did not appear to have any problem with her feet as he observed that she was able to walk to the wheelchair before the incident began. Grant stated that he did not notice any injuries to either plaintiff or her daughter after the incident and that he would have documented any injuries.

{¶18} During cross examination, Grant demonstrated the procedure that was used to take Ferguson to the floor, which he described as quick and brief. Grant stated that he held Ferguson's arms as his supervisor placed her in handcuffs and that she was lifted up off the floor seconds later.

{¶19} Jeffrey Hoffman testified that on the day of the incident he was assigned as a Sergeant and the Lead Security Officer when he was notified by radio of an unruly patient in the ER. Hoffman was informed of allegations that plaintiff had struck both a nurse and Ferguson. When Hoffman observed plaintiff and her daughter become involved in an altercation with defendant's staff, he responded by physically controlling Ferguson, who began kicking and swinging her arms. According to Hoffman, Ferguson was attempting to strike the security officers who were trying to control the situation.

Hoffman helped Officer Grant escort Ferguson to another room and then he went to check on plaintiff. Hoffman testified that neither plaintiff nor her daughter appeared to be injured and that he would have notified medical staff and documented any injuries he had observed. Hoffman denied seeing plaintiff flipped out of the wheelchair.

{¶20} Aaron Pollard testified that he was being trained as a security guard when he responded to an unruly patient call and arrived to see plaintiff refusing to leave the ER. Pollard stated that plaintiff demanded a sandwich and continued to refuse to leave. Although Pollard tried to defuse the situation, he observed that the confrontation escalated. Pollard testified that plaintiff's wheelchair was against a wall when she stood up and began swinging at OSUWMC staff. According to Pollard, plaintiff was not pushed or "dumped" out of the wheelchair. Pollard and another officer tried to restrain plaintiff when her daughter joined the altercation. Pollard and Officer Shaffer took plaintiff to the ground after they were unable to "place her on the wall" to control her movement. Pollard denied hitting or otherwise using excessive force against plaintiffs and he testified that plaintiff did not have any injuries as a result of the incident.

**Assault and battery**

{¶21} Plaintiffs allege that they were physically assaulted and battered by OSUWMC personnel. "[T]he tort of assault is defined as the willful threat or attempt to harm or touch another offensively, which threat or attempt reasonably places the other in fear of such contact." *Smith v. John Deere Co.*, 83 Ohio App.3d 398, 406 (10th Dist.1993). To establish a claim for civil battery, a plaintiff must demonstrate that the defendant acted intending to cause a harmful or offensive contact and, in fact, a harmful contact results. *Love v. Port Clinton*, 37 Ohio St.3d 98, 99 (1988). "Contact which is offensive to a reasonable sense of personal dignity is offensive contact." *Id.*, citing Restatement of the Law 2d, Torts, at 35, Section 19.

{¶22} As an initial matter, the court notes that there is no dispute that defendant's employees were acting within the course and scope of their employment when the

alleged intentional torts were committed.  "It is well-established that in order for an employer to be liable under the doctrine of respondeat superior, the tort of the employee must be committed within the scope of employment.  Moreover, where the tort is intentional, * * * the behavior giving rise to the tort must be 'calculated to facilitate or promote the business for which the servant was employed[.]'" *Byrd v. Faber*, 57 Ohio St.3d 56, 58 (1991), quoting *Little Miami RR. Co. v. Wetmore*, 19 Ohio St. 110, 132 (1869).  "In other words, an employer is not liable for independent self-serving acts of his employees which in no way facilitate or promote his business." *Id.* at 59, quoting *Vrabel v. Acri*, 156 Ohio St. 467, 474 (1952).  The Supreme Court of Ohio has observed that "the removal of patrons, who may be unruly * * * or otherwise ineligible to enter, is calculated to facilitate the peaceful and lawful operation of the business." *Byrd, supra,* at 59 (1991).  Inasmuch as the actions of defendant's staff were taken to facilitate OSUWMC's business, defendant would be liable for any tort committed by its employees which arose out of those actions.

**Privilege**

{¶23} An OSUWMC employee may use force in self-defense where the employee can show the following: "(1) that he was not at fault in creating the situation giving rise to the affray; (2) that he had a bona fide belief that he was in imminent danger of bodily harm and (3) that he did not violate any duty to retreat or avoid the danger." *Bailey v. Bevilacqua*, 158 Ohio App. 3d 382, 385, 2004 Ohio 4392, 815 N.E.2d 1136, 2004 Ohio App. LEXIS 3978 (Ohio Ct. App., Portage County 2004) *See Estill v. Waltz,* 2002 -Ohio- 5004 at ¶ 123, 24, (2002).  "In cases involving the use of non-deadly force, there is no requirement that a person retreat to avoid the danger, even if such retreat is possible." *Young v. Spires*, C.P. No. 12CVC-5524, 2013 Ohio Misc. LEXIS 10152 (Apr. 23, 2013); *State v. Perez*, 72 Ohio App. 3d 468, 472 (1991); *Columbus v. Dawson*, 33 Ohio App. 3d 141, 142 (1986).

{¶24} Furthermore, "a private person is privileged to use force against another or to impose confinement upon him for the purpose of terminating or preventing the renewal of an affray or an equally serious breach of the peace which is being or has been committed in the actor's presence or of preventing such other from participating therein, if:

{¶25} '(a) the other is or the actor reasonably believes him to be participating or about to participate in the affray, and

{¶26} '(b) the confinement or force is not intended or likely to cause death or serious bodily harm, and

{¶27} '(c) the actor reasonably believes that the force or confinement is necessary to prevent the other from participating in the affray or other equally serious breach of the peace.  Restatement of the Law 2d, Torts 252, Section 141 (1965).

{¶28} The evidence showed that OSUWMC's security policy authorized its security officers to use force.  Wollenberg, OSUWMC's Associate Director of Security, identified the use of force policy that was in effect at the time of the incident, which specifically addresses the use of force on patients as follows:

{¶29} "Security Officers may be requested by nursing or medical staff to assist in controlling an unruly or combative patient.  Typically, this will occur in the Emergency Department, but may occur at any of the other patient areas in the hospitals.

{¶30} "The Security Officer(s) must ensure that actions are at the specific documented request of medical or nursing staff and that staff remain present during the restraining procedures.  All such indents will be documented regardless of the actual action taken.

{¶31} "The minimum amount of force will always be used to control any violent or combative person.  At no time will the Security Officer use a 'choke hold' or any other technique that was not specifically shown to the Security Officer during training." (Defendant's Exhibit B.)

{¶32} Although plaintiffs allege that they were assaulted by defendant's employees, defendant contends that plaintiffs initiated the altercation and that its employees used only the minimal amount of force that was necessary to control plaintiffs' unruly conduct and to prevent them from injuring staff. The court finds that plaintiffs' version of the events was not credible. Regarding plaintiff's interaction with Nurse Pierce, plaintiff testified that she did not hit Pierce and that she lost consciousness during a seizure and later regained awareness when a security guard was in the examining room. However, Nurse Pierce provided credible testimony that she had observed many seizure patients, that plaintiff was interacting with her while she was being treated, and that plaintiff suddenly struck her while she was assessing plaintiff's vital signs. Pierce explained that plaintiff did not exhibit behavior that was consistent with a seizure. Pierce also testified that plaintiff appeared to be upset with her at the time of the incident.

{¶33} Regarding the altercation that began while plaintiff was sitting in a wheelchair, the court finds that plaintiffs' testimony about the incident also was not credible, particularly with regard to the conduct of defendant's employees who responded to the altercation. Although plaintiff testified that she was unable to lift her feet due to neuropathy, the evidence showed that she was able both to walk to the wheelchair and to quickly stand up from a sitting position moments after she claimed that she could not move her feet. To accept plaintiff's version of the incident, the court would have to believe that her seizures caused her to intermittently lose consciousness and swing her limbs violently while yelling, and then suddenly regain consciousness such that she was aware of her surroundings and the circumstances that caused her to yell at OSUWMC staff and demand food. Plaintiff admitted that she became upset when someone allegedly pointed a finger in her face. However, she testified that she did not recall demanding a sandwich, although several of defendant's employees testified that they did recall those demands. Although plaintiff testified that she had

another seizure when she was "flipped" from her wheelchair onto the floor and did not recall being handcuffed, she testified that she did recall her daughter being "flipped" onto the floor and restrained by security guards soon thereafter.

{¶34} The court finds that Ferguson's testimony about the incident was also not credible. Ferguson admitted that the altercation began when her mother became upset and stood up from sitting in the wheelchair after a woman pointed a finger in her mother's face. However, Ferguson also testified that her mother had a seizure and was flipped out of her wheelchair. According to Ferguson, she went to help her mother but a security guard pulled her to the ground by her hair and then, after she had been on the floor for about five minutes, she was dragged down the hall. Ferguson's recollection of the altercation was not credible and conflicted with the credible testimony of defendant's medical and security staff who recalled that plaintiffs were the aggressors during the altercation.

{¶35} Upon review of the evidence, the court finds that the use of force upon plaintiffs was reasonable and not excessive in that plaintiffs refused to leave the ER and initiated a physical altercation with OSUWMC staff. The court further finds that defendant's security staff reasonably believed that force was necessary to control plaintiffs' aggression towards EMT Shackle and the security guards who responded to the altercation. The court concludes that the force that was used by defendant's employees was reasonable and not likely to cause harm to plaintiffs.

{¶36} The evidence showed that OSUWMC's security staff was adequately trained to de-escalate confrontations and to use the minimum amount of force necessary to control uncooperative patients and guests. The court finds that defendant's medical staff and security guards were credible in describing both plaintiffs' conduct and the methods that were used by OSUWMC's security staff in responding to the altercation.

{¶37} The court is persuaded by the testimony that defendant's security officers used only the force that was necessary to restrain plaintiffs after they escalated the confrontation into a physical altercation. Accordingly, the court finds that defendant's security staff did not exceed their privilege to use reasonable force to prevent plaintiffs from participating in the affray.

{¶38} Furthermore, the court finds that plaintiffs' testimony regarding the injuries which they alleged they sustained as a result of the incident was particularly lacking in credibility. The court concludes that defendant's security staff did not inflict the injuries depicted in plaintiffs' photographic exhibits and that its staff was credible in their testimony that they would have documented such injuries in both security incident reports and medical records. Based upon the testimony, the court is convinced that OSUWMC's medical staff would have treated such injuries and that plaintiff would not have been discharged in that condition.

{¶39} Based upon the foregoing, the court finds that plaintiffs failed to prove by a preponderance of the evidence that defendant's staff used excessive force which amounted to assault and battery. Accordingly, judgment is recommended in favor of defendant.

{¶40} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____

ANDERSON RENICK
Magistrate

**Filed May 30, 2018**
**Sent to S.C. Reporter 6/12/18**